1999 ND 112

**Paul ENGEBRETSON, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee,**

**Melroe Company, Respondent**

**No. 990005.**

Supreme Court of North Dakota.

June 18, 1999.

Rehearing Denied July 13, 1999.

Dean J. Haas, Dietz, Little & Haas, Bismarck, for claimant and appellant.

David E. Reich, Special Assistant Attorney General, Pearce and Durick, Bismarck, for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Paul Engebretson appealed from a district court judgment affirming the dismissal of his claim for benefits by the North Dakota Workers Compensation Bureau. We affirm.

I

[¶ 2] Engebretson worked for the Melroe Company for approximately ten years. On June 13, 1997, Engebretson filed a claim with the Bureau for benefits alleging an injury to his lungs from workplace exposure to fumes and particulate matter. Engebretson contends the alleged work injury occurred May 27, 1997. On the date of the alleged work injury, Engebretson was employed as a lathe operator. He alleges the injury to his lungs occurred while working over the years as a machinist at Melroe.

[¶ 3] Prior to and following the filing of his claim, Engebretson consulted a number of physicians. May 23, 1997, Engebretson was examined by Dr. Jay Huber for complaints of a cough and throat irritation. Following the examination, Dr. Huber's diagnosis was probable reactive airway disease. Dr. Huber's secondary diagnosis was obsessive/compulsive disorder and gastroesophageal reflux disease.

[¶ 4] May 29, 1997, Engebretson saw Dr. Tommy Ko for a pulmonary consultation. In his written report, Dr. Ko pointed out that Engebretson has smoked about one pack or less of cigarettes per day for ten years. He noted that Engebretson quit smoking three years ago, but now smokes around one to four cigars per week. The report also stated Engebretson has additional factors which may be responsible for his pulmonary symptoms including pets in the home. These pets include: a dog, cats and several birds. Dr. Ko diagnosed Engebretson with chronic episodic nonproductive cough, chest tightness and dyspnea. However, he explained that "[g]iven the patient's history, it is difficult to decipher which is the primary ideologic [sic] agent or cause for his underlying pulmonary symptoms."

[¶ 5] June 13, 1997, Dr. Huber again examined Engebretson. Dr. Huber's primary diagnosis was fatigue and his secondary diagnosis was shakiness after meals, mild reactive airway disease and obsessive compulsive disorder. In his report, Dr. Huber wrote: "Patient does have mild reactive airway disease. He is obsessed with the fact that problems at work are causing him a great deal of difficulties. He may very well have exacerbation of his reactive airway disease secondary to occupational inhalants." Following the examination, Dr. Huber sent a letter to Melroe asking that Engebretson be released from work for seven to ten days for a pulmonary evaluation.

[¶ 6] Engebretson was again examined by Dr. Ko on June 16, 1997. Dr. Ko's primary diagnosis was mild COPD (chronic obstructive pulmonary disease), reversible airways disease. His notes explain that by history the diagnosis "certainly suggests occupationally related lung disease. This certainly has to be confirmed by objective data such as a pulmonary function test off work and also at work site." Dr. Ko recommended Engebretson consult Dr. Pedro Mendoza, an occupational/pulmonary medicine specialist for a second opinion.

[¶ 7] On June 17, 1997, Engebretson was examined by Dr. Mendoza. Dr. Mendoza's notes from that visit state, in part,:

Although the clinical presentation is of a mild obstructive airways disease, I suspect that his cough, as well as symptom complex, is probably due to a restrictive component due to exogenous obesity and aspiration in view that there is documented reflux, but more importantly to the possibility of having a hypersensitivity pneumonitis due to birds.

Dr. Mendoza tested Engebretson for sensitivity to some bird droppings and Engebretson tested positive to Parakeet droppings. Dr. Mendoza also ordered a pre and post work lung function test to be

conducted on July 21, 1997. For testing purposes, Dr. Mendoza cleared Engebretson to return to work on July 16, 1997. However, Engebretson did not return to work until July 21, 1997 and was assigned to a different position. The lung function test was conducted later that day. The test results showed no significant difference in Engebretson's pre and post work lung function. However, in order for the test to be valid, Engebretson needed to be back at work for a week and working in the same capacity.

[¶ 8] Engebretson stopped working at Melroe on July 22, 1997, and was placed on medical leave status. On September 5, 1997, Engebretson was examined by Dr. Hughes complaining of a cough. Following his examination, Dr. Hughes determined that Engebretson's pulmonary function tests were compatible with a mild obstructive impairment. His notes state: "If we are to diagnose asthma by Methacholine challenge, his cough could be attributed to asthma aggravated by irritant exposure on the job." Therefore, Dr. Hughes suggested Engebretson take a Methacholine challenge to rule in or out the diagnosis of asthma.

[¶ 9] An administrative hearing on Engebretson's claim was held on May 7, 1998. Following the hearing, the administrative law judge (ALJ) recommended denial of Engebretson's claim. In reaching this conclusion, the ALJ made the following recommended findings of fact:

22. No doctor ... has opined that workplace exposure to various fumes and particles actually caused Engebretson's asthma or lung condition, i.e., at its inception.

23. The evidence does not show, by the greater weight of the evidence that exposure to fumes and particles at Melroe over the years actually was the cause of Engebretson's asthma or lung condition, at its inception.

24. In the totality, the evidence also does not show, by the greater weight of the evidence, that exposure to fumes and particles at Melroe over the years aggravated or substantially worsened the severity of, or substantially accelerated the progression of Engebretson's asthma or lung condition. The evidence does not even show that the fumes and particles were a trigger, though that is certainly possible. Indeed, it is possible that the fumes and particles are the cause at the inception, or an aggravating, substantial worsening or substantial accelerating factor. But that is speculation based on the objective medical evidence.

On August 13, 1997, the Bureau adopted the ALJ's recommended findings and conclusions, and issued an order dismissing Engebretson's claim. The district court affirmed the Bureau's order, and Engebretson appealed to this Court.

[¶ 10] Appellate review of a Bureau decision to deny workers compensation benefits is governed by section 28–32–19, N.D.C.C. *McDaniel v. North Dakota Workers Comp. Bureau*, 1997 ND 154, ¶ 11, 567 N.W.2d 833. We review the decision of the Bureau, rather than that of the district court. *Maginn v. North Dakota Workers Comp. Bureau*, 550 N.W.2d 412, 415 (N.D.1996). Under section 28–32–19, N.D.C.C., we affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, or its decision is not in accordance with the law. *Hoyem v. North Dakota Workers Comp. Bureau*, 1998 ND 86, ¶ 5, 578 N.W.2d 117; N.D.C.C. § 28–32–19. In evaluating the findings of fact, we do not make independent findings or substitute our judgment for the Bureau, but determine only whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire record. *Hibl v. North Dakota Workers Comp. Bureau*, 1998 ND 198, ¶ 7, 586 N.W.2d 167.

## II

[¶ 11] The primary issue on appeal is whether Engebretson's lung condition is a compensable injury. In order to participate in the workers' compensation fund, a claimant has the burden of proving a compensable injury by a preponderance of the evidence. *Geck v. North Dakota Workers Comp. Bureau,* 1998 ND 158, ¶ 5, 583 N.W.2d 621; N.D.C.C. § 65–01–11. Unless otherwise provided, the statutes in effect on the date of an injury govern workers' compensation benefits. *Id.* at ¶ 6. Section 65–01–02 (1995), N.D.C.C.,[1] in effect at the time of Engebretson's alleged injury, defines "compensable injury" as "an injury by accident arising out of and in the course of employment which must be established by medical evidence supported by objective medical findings." The statute further stated that a compensable injury includes:

(1) Any disease that can be fairly traceable to the employment. Ordinary diseases of life to which the general public outside of the employment is exposed are not compensable except where the disease follows as an incident to, and in its inception is caused by a hazard to which an employee is subjected in the course of employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee.

N.D.C.C. 65–01–02(9)(a)(1) (1995). A disease is "fairly traceable" to a claimant's employment where there is a direct causal connection between the work conditions and the disease. *See* N.D.C.C. § 65–01–02(18)(a) (1995).

[¶ 12] After reviewing the record in the present case, we conclude a reasoning mind could have determined, as did the Bureau, that the greater weight of the evidence indicates Engebretson's lung condition was not causally related to his employment at Melroe. The Bureau relied upon the testimony and medical records of the examining physicians in reaching its conclusion Engebretson failed to prove a cause and effect relationship between his lung condition and his workplace exposure.

[¶ 13] Each of the physicians asked to give their opinion regarding causation either stated they could not objectively conclude Engebretson's exposure to fumes and particles at Melroe was the cause of his lung condition or refused to address the issue. For example, Dr. Mendoza testified by deposition that he did not have an opinion as to whether Engebretson's condition was caused by his employment at Melroe:

Q: So based upon the information that you had available—and I don't mean you, Q & R Clinic or MedCenter One. I mean just you, Dr. Mendoza. Based upon that information and the reasonable degree of medical certainty standard that we talked about earlier, I take it you don't have an opinion regarding whether he has occupational asthma?

A: [Dr. Mendoza] He has asthma. Could it be occupational or not? No, I don't have an opinion.

Q: It's possible? Possible yes, possible no?

A: You have two differentials there that could be causing the problem. They're not related in the sense that he may have de novo asthma due to occupational exposure, but he may have de novo asthma due to the hypersensitivity to the birds, or he may have asthma that was

---

1. In 1997, the Legislature amended and reenacted this subsection, which is now codified at N.D.C.C. § 65–01–02(11). Under N.D.C.C. § 65–01–02(11)(b)(7), the term "compensable injury" does not include: "Injuries attributable to a preexisting injury, disease, or other condition, including when the employment acts as a trigger to produce symptoms in the preexisting injury, disease, or other condition unless the employment substantially accelerates its progression or substantially worsens its severity." These amendments did not become effective until August 1, 1997, and are therefore inapplicable to the present case.

caused by the birds and that work makes it worse, or he may have asthma that was caused by the work and the birds make it worse, in that order to me—to my impression, in that order of likelihood.

Thus, Dr. Mendoza determined the cause of Engebretson's lung condition could be either hypersensitivity to birds or workplace exposure. Similarly, during the administrative hearing, Dr. Hughes testified he did not have an opinion as to whether Engebretson's workplace exposure actually caused his lung condition. Rather, his testimony concerned only whether the workplace exposure aggravated Engebretson's condition. Furthermore, in an April 22, 1998 letter from Dr. Huber to Engebretson's attorney, Dr. Huber failed to answer Engebretson's request to comment on causation, stating: "I also have been asked to comment on causation. It is very difficult to be able to link anybody's asthma with a causative agent."

[¶ 14] There is no medical testimony or evidence in the record showing Engebretson's exposure to fumes and particles at Melroe over the years was a cause of Engebretson's lung condition at its inception. We, therefore, conclude the Bureau's findings were supported by a preponderance of the evidence.

### III

[¶ 15] Under section 65–01–02(9)(b)(6) (1995), N.D.C.C., the term "compensable injury" does not include:

Injuries attributable to a preexisting injury, disease, or condition which clearly manifested itself prior to the compensable injury. This does not prevent compensation where employment substantially aggravates and acts upon an underlying condition, substantially worsening its severity, or where employment substantially accelerates the progression of an underlying condition. It is insufficient, however, to afford compensation under this title solely because the employment acted as a trigger to produce symptoms in a latent and underlying condition if the underlying condition would likely have progressed similarly in the absence of the employment trigger, unless the employment trigger is determined to be a substantial aggravating or accelerating factor. An underlying condition is a preexisting injury, disease, or infirmity.

Thus, Engebretson is entitled to benefits for a preexisting disease only if he can prove by a preponderance of the evidence that his lung condition was substantially aggravated or accelerated by his employment.

[¶ 16] The Bureau's conclusions are based on the lack of medical evidence linking Engebretson's exposure to fumes and particles at Melroe to his lung condition. In its findings of fact, the ALJ determined: "The evidence does not even show that the fumes and particles were a trigger, though that is certainly possible. Indeed, it is possible that the fumes and particles are the cause at the inception, or an aggravating, substantial worsening or substantial accelerating factor. But that is speculation based on the objective medical evidence."

[¶ 17] Engebretson relies heavily upon the testimony of Dr. Hughes and Dr. Huber. When asked to comment on the connection of Engebretson's occupational exposure and its relationship to his asthma, Dr. Huber wrote: "There is no doubt that inhalants of any sort, occupational or not, can aggravate asthma in multiple ways. It is my opinion that Mr. Engebretson's asthma in fact is aggravated by certain inhalants at his work place." Similarly, at the administrative hearing, Dr. Hughes testified Engebretson's workplace exposure was aggravating and accelerating his condition.

[¶ 18] While there is some evidence to support Engebretson's claim, the greater weight of the evidence does not support Engebretson's claim. We agree with the Bureau's finding that the minimal evidence

linking Engebretson's exposure to workplace fumes and particles to his lung condition is merely speculative and does not support a finding of substantial aggravation.

[¶ 19] Dr. Mendoza, the occupational/pulmonary medicine specialist, testified through deposition that workplace aggravation had not been proven in this case. Mendoza stated there was a 50 percent chance Engebretson's lung condition was due to his hypersensitivity to birds and a 50 percent chance his condition was due to workplace fumes and particles. Mendoza further testified "[a]lthough it's very hard to prove or disprove, there's a way of doing it. The thing is that he never gave us the opportunity to do that." Thus, according to Dr. Mendoza, testing was both appropriate and necessary to determine whether Engebretson's employment at Melroe was substantially aggravating his lung condition. However, Engebretson did not cooperate with the procedures for the administration of the pre and post work lung function test administered on July 21, 1997. Instead of returning to work on July 16, 1997, the date Dr. Mendoza cleared Engebretson to return to Melroe, he did not return to work until July 21, 1997, the day of the test.

[¶ 20] In addition, Dr. Ko's notes following his examination of Engebretson state that while Engebretson may have occupationally related lung disease, his condition could not be confirmed without objective data. According to Dr. Ko, a pulmonary function test out of and at the work site was needed for proper documentation of Engebretson's condition. Furthermore, even Dr. Hughes testified he wanted to work with Engebretson to make additional determinations, but he did not have the opportunity:

Q: But the birds—the presence of birds inside a home could also produce nonspecific airway irritants; is that a fair statement?

A: [Dr. Hughes] It could, yes.

Q: And to the extent that one spends a significant again the more time you spend at home or at work if there are not specific airway irritants in either the place I take it the greater amount of time you spend in that location the more the potential for exacerbation of these symptoms?

A: Correct. My problem in representing this as a workplace exposure was that it was also difficulty [sic] in the home so my suggestion was to try to come into it with a clean home environment in a sense have clean hands in regard to the workplace exposure.

Q: And you never had that opportunity?

A: Correct.

[¶ 21] Due to the invalidity of the pre and post work lung function test administered on July 21, 1997 and the absence of any other test results concerning Engebretson's lung function, there is no data to either confirm or deny the possibility Engebretson's workplace exposure to fumes and particles aggravated his lung condition. Therefore, we conclude a reasoning mind could have determined the greater weight of the evidence is that Engebretson's lung condition was not substantially aggravated or accelerated by his employment.

IV

[¶ 22] Upon reviewing the entire record in this case, we conclude the Bureau's findings Engebretson's lung condition was not causally related to his employment and that his condition was not substantially aggravated or accelerated by his employment are supported by a preponderance of the evidence. In turn, these findings support the Bureau's conclusion Engebretson has not proven he is entitled to compensation. Accordingly, the judgment of the

district court affirming the Bureau's order of dismissal is affirmed.

[¶ 23] SANDSTROM, NEUMANN and KAPSNER, JJ., concur.

MARING, Justice, specially concurring.

[¶ 24] I agree with the majority's conclusion the Bureau correctly determined the greater weight of the evidence failed to prove a direct causal connection between Engebretson's work conditions at Melroe and his asthma, or that Engebretson's work environment substantially aggravated his asthma. I write separately only to clarify that a physician's medical opinion based on an examination, a patient's medical history, and the physician's education and experience can be "objective medical evidence."

[¶ 25] The majority states at ¶ 21: "Due to the invalidity of the pre and post work lung function test administered on July 21, 1997, and the absence of any other test results concerning Engebretson's lung function, there is no data to either confirm or deny the possibility Engebretson's workplace exposure to fumes and particles aggravated his lung condition." Because there was no "data" or "test results" confirming or denying substantial aggravation, the majority concludes a reasoning mind could have determined the greater weight of the evidence did not prove Engebretson's asthma was substantially aggravated by his work environment. To the extent the majority opinion may imply only confirming "test results concerning Engebretson's lung function" constitute "objective medical evidence," I disagree.

[¶ 26] It is not that there was no "objective medical evidence" supporting Engebretson's aggravation claim in this case. As the majority notes at ¶ 17, Drs. Huber and Hughes opined Engebretson's asthma was aggravated by his exposure to fumes and particles in the workplace. However, under our standard of review a reasonable person could conclude the greater weight of the evidence showed that Engebretson's asthma was not substantially aggravated by his exposure to fumes and particles in

the workplace. The Bureau's order should be affirmed, therefore, not because of the absence of "objective medical evidence" supporting Engebretson's aggravation claim, but because a reasoning mind reasonably could have determined the findings were proven by a preponderance of the evidence.

[¶ 27] NEUMANN, J., concurs.