2007 ND 23

**Anton FETTIG, Claimant and Appellant,**

v.

**WORKFORCE SAFETY AND INSURANCE, Appellee.**

No. 20060105.

Supreme Court of North Dakota.

Feb. 28, 2007.

**302**

Stephen D. Little, Dietz & Little Lawyers, Bismarck, N.D., for claimant and appellant.

Lawrence A. Dopson, Special Assistant Attorney General, Bismarck, N.D., for appellee.

CROTHERS, Justice.

[¶ 1] Anton Fettig appealed from a district court judgment affirming a Workforce Safety and Insurance ("WSI") order terminating his future benefits after April 20, 2004, and ordering him to reimburse WSI for disability benefits paid between October 16, 1996, and December 31, 2002. We conclude a reasoning mind could rea-

sonably conclude Fettig made willful and material misrepresentations regarding his work activities and income and his physical condition. We affirm.

I

[¶ 2] In August 1993, Fettig was 58 years old and working as a self-employed contract pumper within North Dakota's oil industry when he injured his low back and left hip. Fettig did not work in the contract pumping business after January 1994. Fettig was subsequently diagnosed with chronic low-back pain and post-traumatic sacral deformity. In early 1994, WSI accepted Fettig's workers' compensation claim and paid him associated medical and disability benefits for over ten years. At the time of his injury, Fettig was also engaged in farming and continued to report income from his farm to the Internal Revenue Service in years following his injury. Fettig did not, however, report this farm income to WSI in his required monthly work status and income reports.

[¶ 3] In 2002, Fettig's file was reviewed by a WSI claims analyst. Fettig continued to claim to be disabled although he had been receiving minimal medical treatment. WSI hired an investigator to determine whether Fettig was entitled to continued benefits. After further investigation, on March 30, 2004, WSI issued a Notice of Intention to Discontinue Benefits ("NOID"), informing Fettig that he had made willful false statements in violation of N.D.C.C. §§ 65–05–08 and 65–05–33 and that all future benefits would be terminated after April 20, 2004. WSI also determined an overpayment of benefits occurred as a result of his willful false statements, which included failing to report his income and work activities on his Income and Work Status Cards and Injured Worker Status Reports and making material and false statements and misrepresen-

tations to WSI representatives regarding his physical condition, capabilities, and activities during a functional capacity evaluation ("FCE"). Fettig requested reconsideration of the NOID.

[¶ 4] On April 28, 2004, WSI issued an order denying Fettig further benefits and ordering him to repay previously paid benefits. WSI's order required Fettig to repay $150,604.71 for disability payments from July 26, 1996, through April 20, 2004, and for permanent partial impairment ("PPI") benefits paid on September 10, 2002. WSI's order required Fettig to forfeit all future benefits on his claim after April 20, 2004. Fettig requested reconsideration.

[¶ 5] After an evidentiary hearing, an administrative law judge ("ALJ") determined WSI did not carry its burden with regard to requiring reimbursement of disability benefits paid after 2002, nor with respect to the PPI benefits paid. The ALJ's recommended order required Fettig to repay disability benefits paid from October 16, 1996 (identified by WSI as the date of Fettig's first willful misrepresentation) through December 31, 2002. The ALJ also recommended terminating Fettig's benefits after April 20, 2004, "on the basis that he had willfully and intentionally made material false statements to WSI about his income and work activities, and had willfully and intentionally misrepresented his physical condition and capabilities in conjunction with functional capacity evaluations and a permanent partial impairment evaluation."

[¶ 6] Specifically, the ALJ found that between 1996 and 2002 Fettig willfully failed to report his work activities and income from his farming operations:

1. In April 1995 Anton Fettig prepared a United States Department of Agriculture document titled "Farm Operating Plan for Payment Eligibility Review for Individual." ... Part 9 of that document instructed him to disclose the amount of "cropland acres" owned by him, leased from others, and leased to others. Mr. Fettig represented that he owned a 100% interest in 287.4 acres and that he leased no acreage to others. He stated that he cash-rented 98.7 acres from Fritz Birdbear, 136.4 acres from Veronica Baker, and 2 acres from what appears to be "Heirs of Allotment 853A & 3172." He further represented that he leased several parcels from others on a 50/50 crop share basis: specifically, 471.1 acres from Howard Fettig, 156.4 acres from Morgen Fettig, 120.5 acres from Laverne Fettig, 282.7 acres from Gabriel Fettig, and 249.7 acres from Charles Fettig. Part 13 of the application instructed: "Enter the estimated percent or hours of labor required for this farming operation which is provided by you personally, hired laborers, or others." It then asked: "What estimated percent or hours of active personal labor do you provide?" Mr. Fettig wrote—100%. The application included an attachment titled "Definitions," which explained to him that the term "active personal labor" means personally providing physical activities necessary in a farming operation, including activities involved in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities in the farming operation. He entered nothing for the remaining categories: "hired labor" and "other labor." Part 14 of the application instructed: "Enter the estimated percent of the farming operation's total management responsibility and the type of managerial duties required for this farming operation which are provided by you personally or by hired management." In response to the instruction: "Enter the estimated percent of active

personal management provided by you." Mr. Fettig wrote "100%." Part 16 of the application, titled "Certification," stated:

I certify that all the information entered on this document and any supporting documentation is true and correct. I understand furnishing incorrect information will result in forfeiture of payments and the assessment of a penalty. I will timely provide written notification to the Agricultural Stabilization and Conservation Committees for the county and State listed in Item 9 of any changes in this farming operation.

Mr. Fettig signed that certification. That farm operating plan was effective for the program years 1996 through 2002.... Mr. Fettig made no changes to the plan during that period other than to file an update on June 18, 1996, changing the acreage figure listed at Part 9 for land owned by him, from 287.4 acres to 281.2 acres, and for land leased from Howard Fettig, from 471.1 acres to 466.7 acres....

2. Mr. Fettig's federal income tax returns for each year from 1996 through 2002 include a "Schedule F–Profit or Loss From Farming." For 1996 he reported farm income of $52,686 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $9,730.... For 1997 he reported farm income of $55,320 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $8,328.... For 1998 he reported farm income of $49,632 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $11,458.... For 1999 he reported farm income of $37,462 from "sales of livestock, produce, grains, and other products you raised" and "ag-

ricultural program payments" of $1,170.... For 2000 he reported farm income of $42,672 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $3,031.... For 2001 he reported farm income of $24,412 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $1,071.... For 2002 he reported farm income of $51,976 from "sales of livestock, produce, grains, and other products you raised" and "agricultural program payments" of $1,045....

3. Mr. Fettig was actively engaged in farming, personally providing physical activities necessary in a farming operation, including activities involved in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities in the farming operation, between January 1, 1996 and December 31, 2002, and he received a total of $314,160 in farm income from sales of livestock, produce, grains, and other products, together with $35,833 in agricultural program payments, during that period.

4. During the period from July 26, 1996 through April 28, 2004, Mr. Fettig filed income and work status reports (Form SFN 7871) with the Workers' Compensation Bureau and its successor, WSI, at intervals of, typically, twenty to thirty days.... The forms he filed between July 26, 1996 and June 29, 1999 were titled "Claimant's Income and Work Status Card," and asked, among other questions: "Have you done any work, whether for pay or not?" On each of the forty cards Mr. Fettig submitted during that period he checked "no" to that question. Those same cards also asked: "Have you received money from any source other than the

Bureau?" Mr. Fettig checked "no" on every card except one, (for September 15, 1998, where he checked "yes" but did not reveal the amount or source of such income). The status reports he filed between July 22, 1999 and April 28, 2004 were titled "Injured Worker Status Report." That report form prefaced a series of questions with the following admonishment: "You must accurately report work of any kind (voluntary, part-time, or full-time) that you do, whether you are paid or not. You must report any money received from work, activities, or services of any kind, regardless of profit or loss. Failure to report any type of work, wages, or other money received, may be a violation of law." The form then asked, among other questions: "Have you gone back to work, or done any type of work for pay or not?" On the 61 forms he turned in during that period, he checked "no" on each one except the last, for April 28, 2004. On that form, (which followed WSI's March 30, 2004 "Notice of Intention to Discontinue Benefits" for making false statements by not reporting income and work activities) he checked "yes" and reported that he worked "April 6–28 part time" checking "cattle watering turn hydrant on off" for Howard Fettig. The status reports Mr. Fettig filed between July 22, 1999 and April 28, 2004 also asked: "Have you received money from *any* source other than from the [Bureau] [NDWC] [WSI]?" and thereafter listed several categories, one of which was "farming." Mr. Fettig sometimes checked "yes" and on those occasions reported such items as interest, dividends, tax refunds or investment income, but never checked the category "farming" and never reported receiving income from farming.

5. Because Mr. Fettig was personally providing physical activities necessary in a farming operation, including activities involved in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities in the farming operation during the calendar years 1996 through 2002, and because he had yearly farm income from sales of livestock, produce, grains, and other products, ranging from $24,412 to $55,320, and yearly agricultural program payments ranging from $1,045 to $11,458 for the calendar years 1996 through 2002, his representations to WSI during that same period that he was not working, and that he had received no money from farming, were false.

6. Mr. Fettig, by virtue of his certification to the United States Department of Agriculture that he was personally providing physical activities necessary in a farming operation, including activities involved in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities in the farming operation during the calendar years 1996 through 2002, and by virtue of his representations to the United States Internal Revenue Service that he received farm income from those farming activities in each of the calendar years 1996 through 2002, knew that his representations to WSI during that same period, that he was not working, and had received no money from farming, were false. Because Mr. Fettig knew that he was engaged in farm work and was receiving substantial sums of money from that farm work, his repeated false statements to WSI that he was not working and was not receiving money from any source were intentional, not inadvertent.

The ALJ found WSI relied on and was misled by Fettig's willful and intentional representations which caused WSI to erroneously pay him disability benefits. The

ALJ found Fettig's false statements were sufficiently material to require forfeiture of future benefits and reimbursement of disability benefits paid between October 16, 1996, and December 31, 2002.

[¶ 7] The ALJ also found Fettig made false statements in connection with his physical evaluations:

9. On September 24, 2003, Mr. Fettig underwent a functional capacity evaluation (FCE) at First Choice Physical Therapy in Minot for the purpose of assessing his physical abilities and limitations with respect to activities such as walking, lifting, climbing, standing, carrying, kneeling, bending, pushing, pulling, and the like. Karen Rasmussen, a physical therapist, administered the FCE on both occasions. At the September 24, 2003 FCE Mr. Fettig presented with an extremely pronounced limp, characterized his pain level as 4 on a scale of 0–5, and represented that his work injury had become so debilitating that he was no longer able to drive....

10. In conjunction with the September 24, 2003 FCE Mr. Fettig was, unknowingly, videotaped engaging in various activities, such as driving from his home south of New Town to Minot and back, walking to and leaving the FCE clinic, and walking at other locations in Minot away from the clinic. While approaching and leaving the clinic Mr. Fettig walked slowly with a pronounced limp. However, once he was away from the clinic his limp disappeared, and he walked evenly, with what might be fairly described as a jaunty gait, displaying no evidence of pain. Contrary to his representation to Ms. Rasmussen that he was no longer able to drive, he was videotaped personally driving his red pickup truck from his home to Minot, driving about Minot, and driving home again....

11. Mr. Fettig's actions, in presenting himself to his FCE evaluator with a pronounced limp, professing severe pain caused by his work injury, and claiming to be incapable of driving because of his work injury, while on the same date walking with an even gait and without any indication of pain when he was not at, or in the vicinity of, the FCE clinic, and driving himself about in his own vehicle, constitute false statements and misrepresentation of his physical ability by deceptive conduct.

12. Mr. Fettig's deceptive conduct, requiring personal knowledge that his true circumstances were other than what he presented them to be, was by its nature knowing and volitional, rather than unintentional or inadvertent, and was, therefore, willful.

13. Mr. Fettig's actions at the time of his September 24, 2003 FCE, of presenting himself to his FCE evaluator with a pronounced limp, professing severe pain caused by his work injury, and claiming to be incapable of driving because of his, work injury, while on the same date walking with an unaffected gait and without any indication of pain when he was not at, or in the vicinity of, the FCE clinic, and driving himself about in his own vehicle, caused Ms. Rasmussen, the FCE evaluator, to conclude that the September 24, 2003 FCE did not provide an accurate assessment of Mr. Fettig's functional abilities....

14. WSI requested the September 24, 2003 FCE in order to obtain updated objective information regarding Mr. Fettig's actual physical abilities.... Because that information was dependent upon an accurate assessment of Mr. Fettig's functional abilities, his willful misrepresentation of his physical abilities by deceptive conduct could have misled WSI or medical experts in determina-

tions affecting his claim, and was, therefore, material.

15. Because Mr. Fettig's willful misrepresentation of his physical abilities by deceptive conduct in connection with his functional capacity assessments could have misled WSI or medical experts in determinations affecting his claim, WSI is entitled to impose the civil penalty of forfeiture of future benefits, provided at NDCC § 65–05–33.

16. It was not shown, by a preponderance of the evidence, that Mr. Fettig's willful misrepresentation of his physical abilities by deceptive conduct in conjunction with the September 24, 2003 FCE, or prior FCEs in 2000 and 2002, actually caused benefits to be paid in error. Therefore those false statements were not sufficiently material so as to allow WSI to impose the civil penalty of reimbursement of benefits paid, provided at NDCC § 65–05–33.

17. Mr. Fettig applied for a permanent partial impairment (PPI) award for his 1993 work injury and was examined by Dean Redington, D.C. on July 23, 2002.... In the course of that examination he represented, among other things, that he had not worked for nine years, and that his left leg was very hard to control and function. Those representations are false. However, the evidence is insufficient to show that Mr. Fettig's representations caused Dr. Redington's final impairment rating of "19% whole person" to be greater than it would have been had he known that Mr. Fettig had been actively engaged in farming in the previous nine years, and that videotapes showed that he ambulates without any evident difficulty. Therefore, it was not shown, by a preponderance of the evidence, that Mr. Fettig's willful false statements, including deceptive conduct which misrepresented his physical ability, in conjunction with his application and evaluation for PPI benefits, affected his PPI rating or amount of award.

[¶ 8] WSI ultimately adopted the ALJ's recommended order, and the district court affirmed WSI's order.

## II

[¶ 9] Under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32, courts exercise only a limited review in appeals from administrative agency decisions. *Forbes v. Workforce Safety & Ins.*, 2006 ND 208, ¶ 10, 722 N.W.2d 536; *Sorlie v. Workforce Safety & Ins.*, 2005 ND 83, ¶ 7, 695 N.W.2d 453. Under N.D.C.C. §§ 28–32–46 and 28–32–49, we affirm WSI's decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 10] We exercise restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of the agency. *Sorlie*, 2005 ND 83, ¶ 7, 695 N.W.2d 453. In reviewing an agency's findings of fact, "[w]e determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Roberts v. North Dakota Workmen's Comp. Bureau*, 326 N.W.2d 702, 704–05 (N.D.1982) (quoting *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D. 1979)). Questions of law, including the interpretation of a statute, are fully reviewable on appeal from an administrative decision. *Forbes*, 2006 ND 208, ¶ 10, 722 N.W.2d 536.

### III

[¶ 11] Fettig argues he did not make willful, material false statements in violation of N.D.C.C. § 65–05–33.

[¶ 12] Section 65–05–33, N.D.C.C., states that a claimant who willfully makes a false statement or who receives disability benefits and willfully fails to notify WSI of work or income from work "shall reimburse the organization for any benefits paid based upon the . . . false statement and . . . shall forfeit any additional benefits relative to that injury." "The legislative intent in N.D.C.C. § 65–05–33 was to create a penalty for anyone who accepts disability benefits for a period of time in which that person is actually working." *Horob v. North Dakota Workers Comp. Bureau*, 2000 ND 114, ¶ 14, 611 N.W.2d 875 (citing *Hayden v. North Dakota Workers Comp. Bureau*, 447 N.W.2d 489, 496 (N.D.1989)).

[¶ 13] Under N.D.C.C. § 65–05–33, to trigger the statutory consequences for a false statement, "WSI must prove: (1) there is a false claim or statement; (2) the false claim or statement is willfully made; and (3) the false claim or statement is made in connection with any claim or application for benefits." *Forbes*, 2006 ND 208, ¶ 13, 722 N.W.2d 536 (citing *Hausauer v. North Dakota Workers Comp. Bureau*, 1997 ND 243, ¶ 12, 572 N.W.2d 426). For purposes of this statute's civil penalties, we have "defined 'willfully' as conduct engaged in intentionally and not inadvertently." *Forbes*, at ¶ 13 (citing *Dean v. North Dakota Workers Comp. Bureau*, 1997 ND 165, ¶ 15, 567 N.W.2d 626). WSI "must prove the claimant's state of mind was purposeful in making the false statement." *Hausauer*, at ¶ 14. "A state of mind can rarely be proven directly and must usually be inferred from conduct and circumstantial evidence." *Dean*, at ¶ 20. "In addition to proving that a false statement is willful, WSI must . . . prove the false statement is material." *Forbes*, at ¶ 14.

> Based upon the language of N.D.C.C. § 65–05–33 and the civil penalty sought, two tests are used to determine "materiality." If WSI seeks reimbursement for benefits paid, the level of materiality required is proof by WSI that the false claim or false statement caused the benefits to be paid in error. If WSI seeks only forfeiture of future benefits, however, no such causal connection is required. Thus, a false claim or false statement is sufficiently material for forfeiture of future benefits if the statement simply could have misled WSI or medical experts in deciding the claim. Ultimately, WSI's findings under N.D.C.C. § 65–05–33 must be affirmed if they are supported by a preponderance of the evidence.

*Id.* (citations omitted). Here, the ALJ's order, as adopted by WSI, required both

forfeiture of future benefits and reimbursement of disability benefits paid to Fettig between October 16, 1996, and December 31, 2002.

[¶ 14] Fettig argues he did not report his farming activities to WSI because his pre-injury income from farming was never factored into his average weekly wage or his disability benefit. Fettig essentially asserts he did not "willfully" make a material false statement because he reasonably believed he did not need to report his farming activity as work since it was not considered for purposes of awarding him benefits in the first place. During the administrative hearing, Fettig maintained he was not involved in the farming operation at all, he had turned over the operation to his sons, and his sons did all of the farming. Despite the significant farming income and expenses which appeared on his tax returns from farm operations from 1996 though 2002, Fettig maintained the farm income was from the sale of grain harvested prior to his 1993 work injury.

[¶ 15] Fettig argues he did not willfully fail to report his farming activities to WSI by representing he had done "no work" during the relevant period. However, the ALJ specifically found that because Fettig "knew that he was engaged in farm work and was receiving substantial sums of money from that farm work, his repeated false statements to WSI that he was not working and was not receiving money from any source were intentional, not inadvertent."

[¶ 16] Section 65–05–08(3), N.D.C.C., requires an injured employee to report, among other things, "work" and "work activities" to WSI. Although neither WSI nor the legislature had defined "work" for the period relevant to the disposition of this case, we have held certain activities may be "work" in the ordinary sense or by common understanding.[1] *Snyder v. North Dakota Workers Comp. Bureau*, 2001 ND 38, ¶ 12, 622 N.W.2d 712; *Jacobson v. North Dakota Workers Comp. Bureau*, 2000 ND 225, ¶ 15, 621 N.W.2d 141. This Court has previously addressed circumstances where claimants have maintained their activities were not "work" as contemplated by WSI's reporting requirements.

[¶ 17] In *Forbes*, 2006 ND 208, ¶ 16, 722 N.W.2d 536, the claimant, who was found to have made false statements by reporting no work, asserted that she did not consider her sales of cosmetics or her conducting of insurance physicals as work and also testified she considered her activities more of a hobby. This Court concluded WSI could reasonably find her activities constituted work and that her explanations of her understanding were not credible. *Id.* In *Jacobson*, 2000 ND 225, ¶¶ 11–14, 621 N.W.2d 141, the claimant was found to have made false statements by reporting no work activity while he was entering as a professional in major fishing tournaments in a variety of states and receiving support from sponsors. Despite the claimant's contention that fishing was only a hobby, the claimant "regularly reported income from fishing tournaments, in a Schedule C statement of profit or loss from a business, as a part of his federal income tax returns." *Id.* at ¶ 13. In that case, the claimant's activities were found to be work, and this Court held WSI could reasonably find the claimant's explanations of his un-

---

1. Although inapplicable to the present case, WSI has since promulgated N.D. Admin. Code § 92–01–02–51.2, which for purposes of N.D.C.C. § 65–05–08(3) and N.D.C.C. § 65–05–33 defines "work" as "physical or mental effort exerted to do or to make something for any amount of remuneration or physical or mental effort exerted to do or to make something that a reasonable person would consider commonly done or made for remuneration."

derstanding of work were not credible. *Id.* at ¶ 15.

[¶ 18] In both *Forbes* and *Jacobson*, under our standard of review, this Court upheld WSI's determinations that the respective claimants had made false statements by failing to report work, where the claimants' explanations and understanding of work were rejected as not credible. *See also Snyder*, 2001 ND 38, ¶¶ 15–18, 622 N.W.2d 712 (claimant's restaurant activities constituted work, and claimant's concealment of work activities and income were sufficiently material for forfeiture and repayment of benefits).

[¶ 19] Here, the ALJ rejected Fettig's testimony and evidence that he was not involved in the farming operation and therefore did not consider his farming activities to be "work" that needed to be reported to WSI. Instead, the ALJ found Fettig was actively engaged in farming and personally involved in providing the physical activities necessary in the farming operation, including involvement in land preparation, planting, cultivating, harvesting, and marketing of agricultural commodities. The ALJ's findings are supported by a preponderance of the evidence.

[¶ 20] Fettig certified to the United States Department of Agriculture ("USDA") in documents between 1996 and 2002 that he was contributing one hundred percent of "active personal labor" to his farming operation. Fettig filed federal income tax returns reporting farm income of $314,160 from sales of livestock, produce, grains, and other products, and $35,833 in agricultural program payments between 1996 and 2002. However, during that same time period, Fettig filed monthly status reports with WSI in which he repeatedly represented he had done no work and had received no money from any source.

[¶ 21] Fettig testified that, on one hand, the farm income he reported on his tax returns was from the sale of pre–1993 grain he had in storage bins, while on the other hand, that the farm income was actually his sons' farm income that he had reported on his returns. Fettig also testified he had a crop share arrangement with his sons during a portion of the relevant period, contradicting his own testimony that the only grain he had was from crops harvested before 1993. The ALJ ultimately found Fettig's testimony was inconsistent with the other testimony and objective evidence presented and thus not credible and Fettig's true circumstances, supported by the greater weight of the evidence, were that he was actively farming and receiving income from farming during the period of 1996 to 2002.

[¶ 22] We conclude a reasoning mind reasonably could have rejected Fettig's understanding and explanations that his farming activities were not work. *See, e.g., Snyder*, 2001 ND 38, ¶ 12, 622 N.W.2d 712 (as a matter of law, claimant's restaurant activities constituted "work" in its ordinary sense); *Jacobson*, 2000 ND 225, ¶ 15, 621 N.W.2d 141 (based on common understanding of work, claimant's participation in professional fishing tournaments constituted work).

[¶ 23] Fettig also appears to argue the version of N.D.C.C. § 65–05–08 in effect at the time of his injury did not require him to report his farm income and work to WSI. However, "[a] benefit recipient's status may change over time. *See* N.D.C.C. § 65–05–04. WSI can review at any time whether a recipient continues to be disabled. *Id.*; N.D.C.C. § 65–05–08(3)." *Baity v. Workforce Safety & Ins.*, 2004 ND 184, ¶ 35, 687 N.W.2d 714. This Court has explained that N.D.C.C. § 65–05–08(3) "is a legislative recognition that inquiring about a recipient's work activities is an

appropriate part of such an investigation" and "specifically provides a recipient of disability benefits must complete reporting forms 'to retain eligibility for further disability or rehabilitation benefits ... regardless of the date of injury or claim filing.'" *Snyder*, 2001 ND 38, ¶ 9, 622 N.W.2d 712.

[¶ 24] In *Snyder*, at ¶ 2, the claimant, who had suffered a 1988 work injury, was ordered to forfeit future benefits and repay benefits after he was found to have made false statements in connection with his claim. WSI found the claimant had either not reported, or partially reported, work and income on 12 status cards mailed to him in 1998, while he had performed a number of activities at a restaurant for which the restaurant owner had paid him monthly in both money and meals. *Id.* The claimant argued that N.D.C.C. § 65–05–08(3), requiring monthly reports to WSI, did not apply to him because it was not in effect at the time of his 1988 injury. *Snyder*, at ¶¶ 8–9. We concluded Snyder's argument was without merit, recognizing WSI may appropriately investigate whether a recipient continues to be disabled. *Id.* at ¶ 9.

[¶ 25] Similarly, in this case, the ALJ's findings detail numerous work status reports filed with WSI during the relevant period where no farm work or income was reported, while the record reflects Fettig received significant farm income. Fettig asserts that it was reasonable for him not to report his farm income, which he has also characterized as passive income, based upon his understanding of what income and work were considered in awarding him benefits; however, Fettig's argument again goes in part to his credibility before the ALJ. "[WSI] is responsible for assessing the credibility of witnesses and resolving conflicts in the evidence." *Aalund v. North Dakota Workers Comp. Bureau*, 2001 ND 32, ¶ 15, 622 N.W.2d 210. To the extent Fettig asserts he was not required to report his farm activities as work under N.D.C.C. § 65–05–08, we reject Fettig's argument.

[¶ 26] There is substantial evidence in this record about the nature and extent of Fettig's farming activities supporting WSI's conclusions regarding the willfulness and materiality of Fettig's false statements not only about his work activities and income, but also his misrepresentation of his physical condition. This record includes evidence of farm income and expenses Fettig reported on his tax returns, USDA documents for Fettig's participation in government farm programs, and the testimony of an elevator manager and of Fettig's neighbor, all establishing Fettig's personal involvement in farm work.

[¶ 27] The ALJ found Fettig's willful and intentional false statements to WSI on his monthly income and work status reports from 1996 through 2002 in which he stated he had not done any work or received any money from work were relied upon by WSI and caused WSI to pay disability benefits to him. The ALJ thus found Fettig's false statements were sufficiently material to impose both civil penalties of forfeiting future benefits after April 20, 2004, and reimbursing the disability benefits paid from October 16, 1996, through December 31, 2002. The ALJ also found that although Fettig's misrepresentations of his physical condition in connection with his FCE and PPI evaluation could have misled WSI or medical experts, his misrepresentations were not shown by a preponderance of evidence to have caused WSI to pay disability or PPI benefits in error. Thus, the ALJ concluded reimbursement of those benefits on that basis was not appropriate.

[¶ 28] We hold that a reasoning mind reasonably could have found Fettig's will-

ful false statements were proven by the weight of the evidence in the record. We further hold that evidence supports the conclusion that Fettig's false statements were sufficiently material, supporting both the forfeiture of future benefits and reimbursement of past disability benefits. We therefore conclude the findings of fact supporting WSI's order terminating future benefits after April 20, 2004, and requiring reimbursement of disability benefits paid from October 16, 1996, to December 31, 2002, are supported by a preponderance of the evidence. We have considered Fettig's remaining arguments and find them to be without merit.

## IV

[¶ 29]  The district court judgment affirming WSI's order is affirmed.

[¶ 30] GERALD W. VANDE WALLE, C.J., and MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.