2002 ND 186

**Pamela MYHRE, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee.**

No. 20020083.

Supreme Court of North Dakota.

Dec. 4, 2002.

Rehearing Denied Jan. 17, 2003.

Steven L. Latham, Wheeler Wolf, Bismarck, N.D., for claimant and appellant.

Jacqueline Sue Anderson, Special Assistant Attorney General, Fargo, N.D., for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Pamela Jo Myhre appealed from a district court judgment affirming a North Dakota Workers Compensation Bureau's order which denied benefits for her back condition and chemical exposure. We affirm, concluding the Bureau did not err in determining Myhre failed to prove a causal relationship between her employment and her injuries.

I

[¶ 2] Myhre began working as the manager of the upholstery department at

Mac's, Inc. ("Mac's") in May 1995. Myhre made foam cushions at Mac's, an activity which required her to use spray adhesive glue and other chemicals. She also lifted foam and fabric, stood for long periods of time, and walked on concrete floors. Myhre claimed she developed back and foot problems from the lifting, periods of standing, and walking on concrete floors. On November 30, 1999, Myhre filed a workers compensation claim for back and foot injuries. She stopped working at Mac's on November 27, 1999.

[¶ 3] On December 2, 1999, Myhre added aldehyde poisoning to her original claim. An aldehyde is "[a]ny of a class of highly reactive organic chemical compounds obtained by oxidation of primary alcohols, characterized by the common group CHO, and used in resins, dyes, and organic acids." *American Heritage College Dictionary* 32 (3rd ed.1997). Myhre originally called this portion of her claim aldehyde poisoning, but the parties have also used names such as chemical exposure, multiple chemical sensitivity, and chemical poisoning.

[¶ 4] Myhre believes aldehydes in the spray glue and other chemicals made her ill, causing various health problems. She claims the years of exposure to the aldehydes "saturated" her body, and she became "ultrasensitive" to other chemicals, as well as to certain clothing, food, and smells. Besides these sensitivities, Myhre described multiple symptoms including fatigue, general pains, nausea, and headaches. On October 11, 2000, Myhre ultimately went to the Environmental Health Center in Dallas, Texas, a center run by Dr. William Rea. As of the filing of her appellant's brief, Myhre was living on a ranch in Texas.

[¶ 5] Although Myhre sought workers compensation benefits for injuries to her feet and back and for aldehyde poisoning,

the Bureau's initial decision of March 28, 2000, accepted liability only for medical expenses for Myhre's foot problem. Myhre requested reconsideration. On May 24, 2000, the Bureau issued an order comporting with the earlier decision: an award paying reasonable and necessary medical expenses for Myhre's foot problem, but denying benefits for her back injury and the aldehyde poisoning. Myhre again requested reconsideration, and on August 31, 2001, a temporary administrative law judge ("TALJ") issued findings of fact, conclusions of law, and an order which affirmed the Bureau's earlier order. On September 11, 2001, the Bureau issued a final order adopting the TALJ's findings of fact, conclusions of law, and order. On October 9, 2001, Myhre appealed the Bureau's final order. The district court affirmed the Bureau's final order on February 14, 2002.

[¶ 6] Myhre argues the Bureau erred by failing to find a causal relationship between her employment and her back injury and aldehyde poisoning. She also asserts the Bureau did not state its reasons for disregarding the medical evidence favorable to her claim.

## II

[¶ 7] On appeal from a judgment of an administrative agency's decision, we review the decision of the administrative agency, giving respect to the district court's analysis. *Paul v. N.D. Workers Comp. Bureau,* 2002 ND 96, ¶ 6, 644 N.W.2d 884. We limit our review to the record before the agency. *Wanstrom v. N.D. Workers Comp. Bureau,* 2001 ND 21, ¶ 5, 621 N.W.2d 864. "Only items actually in the record may be included in the appendix." N.D.R.App.P. 30(a).

[¶ 8] Under N.D.C.C. § 28–32–46, the district court must affirm an administra-

tive agency order, unless one of the following is present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

Under N.D.C.C. § 28–32–49, this Court reviews the judgment of the district court in an administrative appeal in the same manner as provided in § 28–32–46.

■ [¶ 9] In our appellate review of workers compensation cases,

We exercise restraint in deciding whether the Bureau's findings of fact are supported by a preponderance of the evidence and do not make independent findings or substitute our judgment for that of the Bureau; rather, we decide whether a reasoning mind reasonably could have decided the Bureau's findings were proven by the weight of the evidence from the entire record.

*Paul v. N.D. Workers Comp. Bureau*, 2002 ND 96, ¶ 6, 644 N.W.2d 884. However, we fully review questions of law, such as the interpretation of a statute, on appeal. *Lawrence v. N.D. Workers Comp. Bureau*, 2000 ND 60, ¶ 11, 608 N.W.2d 254.

### III

■ [¶ 10] Myhre had the burden to prove by a preponderance of the evidence a causal connection between her injuries and her employment. *See* N.D.C.C. § 65–01–11; *Negaard–Cooley v. N.D. Workers Comp. Bureau*, 2000 ND 122, ¶ 8, 611 N.W.2d 898. To establish this causal connection, a claimant must demonstrate the work condition was a substantial contributing factor to the injury, not that his or her employment was the sole cause of the injury. *Negaard–Cooley*, at ¶ 8. Under N.D.C.C. § 65–01–02(11), a " '[c]ompensable injury' means an injury by accident arising out of and in the course of hazardous employment which must be established by medical evidence supported by objective medical findings."

### A

■ [¶ 11] Myhre first argues the Bureau erred in denying her benefits for her back condition. The Bureau attributed Myhre's back injury to preexisting conditions and previous injuries. Myhre disputes her back condition resulted from preexisting conditions. Myhre also asserts any previous back condition involved a different area of her back and pain of a different type than the back injury she sustained while working. However, the Bureau found Myhre did not establish a causal connection between her work and her back injury, stating "[t]he record is replete with references to claimant's preexisting back condition."

[¶ 12] The Bureau's findings of fact detailed Myhre's back problems prior to her

employment at Mac's. Myhre was in a car accident in 1992, suffering lateral whiplash. After the accident, she received massage treatment for about eighteen months for her injuries. The Bureau noted the record demonstrated Myhre received chiropractic treatment, including treatment for low back pain, for three years before filing her workers compensation claim. Medical records showed Myhre saw one chiropractor, Dr. Mittet, over seventy times from September 1995 to January 1999. However, Myhre testified she only saw a chiropractor every 6 months for maintenance purposes. In February 1999, she also went to the emergency room and spoke of an incident of severe back pain, occurring after she rolled over in bed and felt something pop in her back. However, when she filed her claim in November of 1999, Myhre stated she never had a prior back injury.

[¶ 13] The Bureau concluded:

As to claimant's allegations of a back injury sustained in the course and scope of her employment at Mac's, Inc. the greater weight of the evidence demonstrates that claimant's back condition is not related to her employment at Mac's, Inc. by competent, objective and reasonable medical evidence. The record is replete with references to claimant's pre-existing back condition. Claimant had been involved in an automobile accident in 1992 for which she treated for over 18 months with complaints of low back pain and cervical pain. Further, several months before claimant submitted her claim for benefits she was treating with Dr. Mittet and Dr. Moon for low back pain shooting into the left hip. These symptoms for which she was receiving treatment are essentially the same as those for which she is now claiming a work related injury.

One of the references in the record is a letter from a review committee of chiro-practors, hired by the Bureau, which supports the Bureau's conclusion Myhre had a preexisting back condition. Although the Bureau's final order does not specifically refer to the committee's letter, the review committee examined Myhre's medical records and found no relationship between Myhre's previous back problems and her employment and "no evidence that this is a work comp injury."

[¶ 14] Under N.D.C.C. § 65-01-02(11)(b)(7), the term compensable injury does not include "[i]njuries attributable to a preexisting injury, disease, or other condition, including when the employment acts as a trigger to produce symptoms in the preexisting injury, disease, or other condition unless the employment substantially accelerates its progression or substantially worsens its severity." Thus, even if Myhre could not prove her employment caused her back injury, she could recover partial workers compensation benefits through an aggravation award, if her employment substantially accelerated or worsened her preexisting back condition. *See* N.D.C.C. § 65-05-15 (detailing the method for calculating aggravation awards). During the deposition, both parties questioned Dr. Derryl Moon, another of Myhre's chiropractors, about the aggravation issue:

Q. [Mr. Latham] Apparently it's your opinion that the low back pain that you are treating her for and the instability in her lower back, it's your opinion that's from her walking and standing on cement floors at work?

A. Those things irritate the low back. Did they cause it? I can't tell you that. I can say that it irritates it.

Q. Would you say that they are a substantial aggravating factors to her low back condition?

A. I had to set it many times so something was irritating the low back.

Q. Okay. And by "irritating," we in the legal field use the word aggravation. Would that be the same thing as you're referring to?

A. Yes.

. . . .

Q. [Ms. Anderson] And, again, when you answered that that—that the work—the employment that Ms.—Ms. Myhre was doing at Mac's was a substantial contributing factor to her low back treatment that you provided, on what are you basing that opinion?

A. I simply meant that what she did would aggravate the condition. Walking on hard surfaces will aggravate a low back.

Q. Did it—did it substantially accelerate the condition?

A. I have no way of—of telling you how much or if it did at all. It aggravated it.

Q. How about substantially worsened the severity of the condition?

A. It's possible, but I can't say positively that did it.

Q. So you can't express an opinion on that?

A. No.

. . . .

Q. [Mr. Latham] Dr. Moon, in reference to that last question, is it more likely than not that it made her condition—her back—that her work made her low back condition worse?

A. It's more likely that it aggravated it enough to give them a great deal of pain. It's like putting a cast on a broken arm. Before you set the bone, you aggravate it.

Thus, Dr. Moon did state, in general, standing on concrete floors would aggravate a low back condition, but he could not express an opinion regarding whether Myhre's work substantially accelerated or worsened the severity of her low back condition.

[¶ 15] Myhre relied on Dr. Moon's overall testimony regarding her back injury to support her back injury claim. However, the Bureau found Dr. Moon's opinion was not supported by objective medical evidence. "Objective medical evidence" may include "a physician's medical opinion based on an examination, a patient's medical history, and the physician's education and experience." *Engebretson v. N.D. Workers Comp. Bureau*, 1999 ND 112, ¶ 24, 595 N.W.2d 312 (Maring, J., concurring). In this case, the Bureau noted Dr. Moon did not appear to have taken Myhre's previous history of back problems into account. Dr. Moon also testified he only had medical records from one chiropractor who previously treated Myhre. The district court judge also noted: "Myhre's own doctor [Dr. Moon] could not state that her work caused the lower back injury." Thus, the Bureau weighed all of the medical evidence and concluded: "[t]he greater weight of the evidence in the record simply does not support an assertion that the claimant's longstanding complaints of low back pain were related to her employment at Mac's, Inc."

[¶ 16] In view of Myhre's history of back injuries and back pain and the lack of specificity in the testimony of her treating chiropractor, we conclude a reasoning mind reasonably could determine Myhre failed to prove by a preponderance of the evidence a causal relationship between her employment and her back condition.

B

[¶ 17] Myhre next argues the Bureau erred in denying her benefits for her chemical exposure claim. Myhre again had the burden to prove by a preponderance of the evidence a causal connection between her health problems and her employment. *See* N.D.C.C. § 65–01–11. The Bureau concluded Myhre failed to prove this causal connection, stating: "[t]he greater weight of the evidence in the rec-

ord does not support the claimant's allegations that she suffered a chemical poisoning, multiple chemical sensitivity or other health problem related to exposure to the chemicals during the course and scope of her employment with Mac's, Inc."

[¶ 18] In reaching its conclusion, the Bureau examined both Myhre's original diagnosis and subsequent doctors' evaluations. Dr. Moon originally diagnosed Myhre with aldehyde poisoning by using kinesiological testing. Dr. Moon described this method of muscle testing during his deposition. Dr. Moon would take a substance suspected of causing allergies and place it on Myhre's upper lip, or he would have Myhre smell the substance. At the same time, Myhre would hold her arm straight out from her shoulder. If she reacted to the substance, she could not hold her arm up when Dr. Moon applied downward pressure. Dr. Moon also diagnosed Myhre with candida sensitivities using kinesiological testing. Her sensitivities would worsen and abate at various visits.

[¶ 19] Although Dr. Moon originally diagnosed Myhre with aldehyde poisoning, he could not make a causal connection between the chemicals Myhre used at work and her health condition. Dr. Moon testified "[a]nything that smells is an aldehyde" and Myhre's symptoms could come from substances in her home, her car, or her work environment. After Dr. Moon's diagnosis of aldehyde poisoning, Myhre consulted other doctors and a nurse practitioner, and the Bureau asked other doctors to review her medical records. Of these medical professionals, only Dr. Rea at the Environmental Health Center, along with his consultants, came to the conclusion Myhre had a chemical injury. Dr. Rea also specifically diagnosed Myhre with a work-related chemical injury.

[¶ 20] Dr. Robert Martino, an occupational health specialist at MeritCare Occupational Health, ultimately found Myhre had no chemical exposure injury, relying on a physical examination and standard laboratory testing, including blood and urine tests and x-rays. The Bureau had independent medical examiner Dr. Brian McCrary, a specialist in occupational medicine with other board certifications and eligibilities, review Myhre's medical records. He found a lack of valid, objective medical evidence to support Myhre's claims. He also challenged the methods of treatment and testing Dr. Rea used at his Environmental Health Center.

[¶ 21] Myhre testified she began to notice a correlation between using the glue and her headaches in the summer of 1998. She also testified she "really started noticing" other physical problems in 1999. Myhre testified she stopped using the glue in November or December of 1998. At this same time, Mac's discontinued using the glue for most purposes, and if a project did need gluing, an employee would spray the cushions outside.

[¶ 22] As previously stated, Myhre testified she noticed a marked increase in her symptoms in 1999. Myhre's condition continued to worsen after she left employment at Mac's in November of 1999. Dr. McCrary explained if Myhre did have a chemical injury, Myhre should have improved when not exposed to the glue. Instead, Myhre claimed her condition worsened, and she now cannot tolerate exposure to various smells and chemicals, such as perfumes, detergents, and food preservatives. Furthermore, Dr. McCrary testified blood or other laboratory testing would detect chemicals if chemical exposure had caused the problems Myhre claimed.

[¶ 23] The Bureau enlisted MeritCare Occupational Health Services to perform a chemical exposure assessment at Mac's. The air test revealed "the levels of the

chemicals present at Mac's, Inc. were below acceptable tolerances and limits and would not be sufficient to cause health problems alleged by the claimant." While this air test did not replicate Myhre's exposure to the spray glue on a daily basis, the testing does demonstrate daily use of the glue did not exceed a safe level. The Bureau also proposed causes other than Myhre's employment which might relate to her multiple health complaints, including a car accident in 1992 and one in May 1999, her past history of migraine headaches, psychiatric problems, and marijuana use.

[¶ 24] Myhre argues the opinion of her treating physician Dr. Rea should receive more weight than those of other doctors involved in her case. We have previously declined to establish a presumption entitling a treating doctor's opinion to "great weight." *Symington v. N.D. Workers Comp. Bureau*, 545 N.W.2d 806, 809–10 (N.D.1996) (declining to adopt rules which rank the weight of evidence offered by physicians of different specialities or of treating and examining physicians). The Bureau must examine and weigh the credibility of the medical evidence. *Id.* at 809 (citing *Latraille v. N.D. Workers Comp. Bureau*, 481 N.W.2d 446, 450 (N.D.1992)).

[¶ 25] However, we do recognize "a long term physician-patient relationship may afford the treating doctor a more comprehensive view of the claimant's medical history and condition." *Boger v. N.D. Workers Comp. Bureau*, 1999 ND 192, ¶ 16, 600 N.W.2d 877. In the present case, Myhre first came to Dr. Rea's clinic on October 11, 2000. By December 19, 2000, he wrote a "To Whom It May Concern" letter describing his diagnosis of work-related chemical sensitivity. Myhre also admitted she only forwarded a few of her medical records to Dr. Rea. Thus, although Dr. Rea was Myhre's treating physician, arguably their relationship did not rise to the level of a long-term physician-patient

relationship, which can provide the physician a more comprehensive view of a patient's medical history and condition.

[¶ 26] The Bureau concluded evidence in the record suggested the medical opinions favorable to Myhre's claim "were based solely on subjective testing and/or subjective complaints and history provided by the claimant." The Bureau also concluded that many of the tests provided as supporting evidence either are not medically recognized or not considered medically or scientifically valid. The Bureau stated "[t]hose test findings were inconsistent with more established and recognized testing such as blood and urine testing all of which have been normal for the claimant since she first suspected that she had suffered chemical poisoning."

[¶ 27] Specifically regarding Dr. Rea's testimony, the Bureau concluded Dr. Rea made findings supporting his diagnosis which were inconsistent with prior findings of other treating physicians. For example, Dr. Rea found Myhre had a positive Romberg's sign, indicating neurological damage. Myhre had a negative Romberg's sign during an earlier physical examination by Dr. Martino.

[¶ 28] Although the Bureau's reasons for accepting certain medical evidence can serve as the explanation for rejecting medical evidence favorable to a claimant, here the Bureau explained the reasons for accepting the medical evidence unfavorable to Myhre's chemical injury claim. *See Hibl v. N.D. Workers Comp. Bureau*, 1998 ND 198, ¶ 10, 586 N.W.2d 167 (citing *Nemec v. N.D. Workers Comp. Bureau*, 543 N.W.2d 233, 238–39 (N.D.1996)). This evidence involved a consistent pattern of standard, objective medical tests showing Myhre did not suffer from aldehyde poisoning. After examining the results of Myhre's medical tests from both parties, the Bureau found: "[t]he only consistency between the various opinions is that objec-

tive blood and urine testing did not show the presence of any harmful toxins or toxins at a harmful level in claimant's body." Thus, the Bureau sufficiently explained its reasons for accepting the medical evidence and conclusions of the doctors who used established medical testing and disregarding medical evidence not recognized by the mainstream medical community.

## V

[¶ 29]  We conclude the Bureau did not err in denying Myhre workers compensation benefits for her back injury or chemical exposure.  Accordingly, we affirm.

[¶ 30] DALE V. SANDSTROM, WILLIAM A. NEUMANN, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.