2007 ND 149

**Timothy R. SWENSON, Claimant and Appellant,**

v.

**WORKFORCE SAFETY & INSURANCE FUND, Appellee,**

and

**Nabors Drilling, USA, Inc., Respondent.**

No. 20070049.

Supreme Court of North Dakota.

Sept. 5, 2007.

894

Stephen D. Little, Dietz & Little Lawyers, Bismarck, ND, for claimant and appellant.

Leo F.J. Wilking, Special Assistant Attorney General, Fargo, ND, for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Timothy R. Swenson appealed from a district court judgment affirming an order of Workforce Safety & Insurance ("WSI") denying him benefits for the treatment of his cervical and thoracic spine. Because the administrative law judge ("ALJ") did not apply the correct standard when evaluating the medical opinions in this case, we reverse and remand for further proceedings.

I

[¶ 2] On May 15, 1997, Swenson injured his lower back while employed as a motorman for Nabors Drilling. Swenson was thirty-seven years old at the time of the incident. WSI accepted his claim for a work-related injury to his lower back and began paying benefits, including reasonable and necessary medical expenses for treatment directly related to that injury.

[¶ 3] Since his work-related injury in 1997, Swenson has undergone extensive treatment on his back and spine, including multiple surgeries and visits with many different doctors. Dr. Darryl Espeland examined Swenson in Baker, Montana, on the date of his injury in 1997 and diagnosed him with acute muscular strain in the right lower back with possible tearing. About two months later, Swenson was still feeling pain in the area and was referred to Dr. Thomas Jacobsen in Bowman, North Dakota, for a second opinion. Dr. Jacobsen determined that Swenson's lower back pain was possibly related to a protruding lumbar disc. WSI then requested that Swenson consult with Dr. Gregory Peterson at Medcenter One in Bismarck. An MRI revealed that Swenson had a herniated disc at L3–L4 on the right and at L4–L5 on the left. In August 1997, Swenson had a partial hemilaminectomy on these two levels of his lumbar spine to remove the extruded discs.

[¶ 4] As a result of this surgery, Swenson's condition temporarily improved. But about June 1998, he began to experience increasing pain in his lower back which radiated into both of his legs. In 1999, he consulted several times with Dr. Peterson about this pain. Dr. Peterson concluded he had "failed spine surgery syndrome." Dr. Peterson also noted there was some miscommunication about the levels of the lumbar spine involved in the previous operation because Swenson had an extra sixth lumbar vertebrae. Therefore, his surgery was actually at L4–L5 on the right and at L5–L6 on the left. In August 1999, Dr. Peterson referred Swenson to a specialist to consider the risks and benefits of a lumbar spine fusion.

[¶ 5] In October 1999, Swenson began treating with Dr. Timothy Garvey at the Twin Cities Spine Center in Minneapolis. On his initial visit patient questionnaire, Swenson indicated he was concerned about pain or numbness in his lower back, neck, legs, feet, and hands. Like Dr. Peterson, Dr. Garvey also noted the presence of an extra lumbar vertebrae, and he used the terminology L4–L5 and L5–S1 to describe the location of Swenson's prior operation. Dr. Garvey recommended Swenson undergo surgery on his lumbar spine to relieve some of the pain. In February 2000, Swenson had a revision decompression and an anterior posterior fusion from L4–L5 and L5–S 1. As a result of the second surgery, Swenson's condition improved for some time. About six months after this operation, in September 2000, Swenson reported to Dr. Garvey that he had also been having problems with his cervical spine. Eventually Swenson's lumbar pain began to increase again, and in March 2001 he had a third operation, this time a lumbosacral decompression and fusion for unilateral spondylolysis at S1–S2, just below his previous two-level fusion. By June 2001,

Swenson reported an increase in pain in his back, neck, and legs, and numbness in his left hand.

[¶ 6] In July 2001, Dr. Garvey ordered an MRI on Swenson's cervical spine in order to diagnose his neck pain. On August 31, 2001, WSI denied payment on this bill, stating Swenson had not proved that his cervical problems were the direct result of his 1997 work injury. On October 25, 2001, WSI denied liability for Swenson's cervical spine problems.

[¶ 7] Swenson continued to treat with Dr. Garvey. In October and December of 2001, Dr. Garvey noted in follow-up visits that Swenson was not making good progress after his last surgery. Dr. Garvey concluded Swenson appeared to have pseudoarthrosis at S 1–S2. In April 2002, Swenson had a fourth operation on his back, a revision lumbar decompression and fusion at S1–S2. After this surgery, Swenson had a three-level lumbar fusion, from L4–L5, L5–S1, and S 1–S2. In his appointments following the 2002 surgery, Swenson continued to report cervical pain to Dr. Garvey, and he also began reporting thoracic pain.

[¶ 8] In early 2003, Dr. Garvey referred Swenson to Dr. Shelley Killen, a specialist in physical medicine and rehabilitation at St. Alexius in Bismarck, for nonsurgical treatment of his spine. Swenson's first appointment with Dr. Killen was on May 30, 2003. He reported pain in all three areas of his spine, including constant pain in his thoracic spine and tightness and limited range of motion in his cervical spine. Dr. Killen diagnosed him with failed back syndrome from the multiple lower back surgeries with continued neuropathic pain, myofascial pain of the entire spine secondary to the lumbar problems and the thoracic problems as a result of extensive fusion below that, and urinary difficulties secondary to lumbar surgery.

In December 2003, Swenson's counsel sent a letter to Dr. Killen inquiring whether his cervical and thoracic conditions were causally related to his approximately fifteen years of work as an oil field laborer. Dr. Killen replied that in her opinion, both conditions were more likely than not related to his fifteen years of heavy oil field work.

[¶ 9] On February 5, 2004, Swenson filed a new claim for a progressive injury to his entire spinal column as a result of his years of work as a rig hand and motorman on oil field drilling rigs. He listed the date of injury as "1978–2004."

[¶ 10] Swenson continued to seek nonsurgical treatment from Dr. Killen. He reported upper back and thoracic pain, in addition to his ongoing lumbar problems. Swenson also requested a referral back to Dr. Garvey at the Twin Cities Spine Center to discuss further possible surgical options. In September 2004, Dr. Garvey ordered MRIs of Swenson's entire spine. The MRI of the cervical spine showed moderate to advanced spondylosis at C5–C6, and spondylosis at C6–C7. The MRI of his thoracic spine showed symptoms consistent with thoracic spondylosis, including areas of mild disc bulging. Swenson also had three-level degeneration in his lumbar spine above his previous fusion. In January 2005, Swenson had yet another operation on his back, for upper lumbar decompression and removal of segmental fixation. At a follow-up visit with Dr. Garvey in March 2005, Swenson reported that he felt somewhat better, but that he still had symptoms in his cervical and thoracic spine. Swenson reported the same problems to Dr. Killen at his multiple appointments with her in 2005.

[¶ 11] On April 20, 2005, WSI issued an order denying any liability for Swenson's cervical or thoracic spine, although it continued to accept his claim for a lumbar

spine injury. In the order, WSI concluded that his cervical and thoracic problems were not related to the 1997 work injury. WSI did not address Swenson's claim of a progressive work-related injury to his entire spine. Swenson requested a rehearing before an ALJ on the order denying him benefits. The ALJ specified the issue to be resolved at the hearing as "whether Timothy R. Swenson has sustained a compensable injury of his cervical and thoracic spine."

[¶ 12] On February 2, 2006, WSI took an oral deposition of Dr. Killen in preparation for the administrative hearing on Swenson's claim of a progressive injury to his entire spinal column. Dr. Killen testified that Swenson's lumbar fusion was at least partially a cause of his cervical and thoracic problems. She stated, "When you lose all of that range of motion due to a fusion, you've got to pick up the motion someplace else. There's no place—it can't go down any further so then it translates up to the thoracic spine." When WSI's counsel asked if that could occur all the way up the neck, Dr. Killen responded:

> Yes. Probably one of the most common things I see is a complaint of neck pain and the problem isn't their neck. They've done something to a shoulder, they've done something to an arm and they've held that arm in a position of comfort for so long that everything tightened up and they're having neck problems. It's similar. The lower part hurts, you hold it, you hold it literally so you don't let it move, and that just translates up, so with time your entire spine becomes involved rather than just the segment that was originally the problem. If it's for one segment, you're probably not going to see the entire spine, but when you take out the whole, entire lumbar portion, I think you can develop myofascial problems all the way up.

Throughout her testimony, Dr. Killen mistakenly thought that Swenson's entire lumbar spine was fused, while he actually had a three-level lumbar fusion. She stressed the importance of the entire lumbar spine being fused several times.

[¶ 13] When questioned by WSI's counsel about a 2004 MRI of Swenson's thoracic spine, Dr. Killen stated that she does not see those type of thoracic degenerative changes until a person is very old, unless they do manual labor. As to the cervical spine MRI, Dr. Killen testified that she would be surprised to see the same type of degeneration in a person at age forty-five who has had a sedentary life. She characterized Swenson's degenerative changes in the cervical and thoracic spine as "[m]ild to moderate," with the cervical spine being more moderate. Dr. Killen stated that there are pain generators in the spine other than nerve roots or discs, such as the facet joints, and that Swenson's MRIs showed neural foraminal narrowing and degenerative bony changes. Dr. Killen attributed Swenson's degenerative spinal changes to a cumulative work injury of fifteen years in the oil field. WSI's counsel and Dr. Killen had the following exchange about her conclusion on this issue:

> Q. Wouldn't it be true, though, Dr. Killen, that a significant majority of men and probably women, too, who work as roughnecks do not develop any significant cervical or thoracic pain?
>
> A. I would disagree with that.
>
> Q. You would say the majority do?
>
> A. I think if they're in the oilfield long enough, I think they do.
>
> Q. Can you cite any—is this just based on your personal ad hoc experience? Can you cite any studies of the oilfield industry or the oil derrick or oil rigger industry?
>
> A. Personal experience.

Q. Personal experience in treating patients?

A. Correct.

Q. How many—how many oilfield workers do you think you've treated?

A. I probably currently treat someplace between 10 and 20—currently.

Q. Currently. I understand. And you have been at St. Alexius for five, six years?

A. I have been here six years.

Q. Right.

A. Trained in Texas.

Q. Right. Did you see any oil derrick people down there? A. Mm-hmm.

Q. But, I mean, you've maybe seen what, 20, 30, 40 in your lifetime?

A. Probably more than that, because even though—that might not be the reason I'm seeing them. I may be seeing them for some other complaints.

Dr. Killen testified that it is not just the oil field, but any of the heavy-labor industries, and that throughout her career she has seen these complaints in people who are performing heavy-labor jobs.

[¶ 14] On February 28, 2006, the ALJ held a hearing to determine whether Swenson had suffered a compensable injury to his cervical and thoracic spine during his many years of work as an oil field laborer. Timothy Swenson and Dr. William Simonet testified at the hearing. Swenson testified that he worked in the oil field for nineteen years, from 1978 to 1997, and that he has not worked since his injury in 1997. At the time of the hearing, Swenson was forty-six years old. On cross-examination, Swenson stated that he got in shape and bulked up by about forty pounds after he started working in the oil field, and that he was a heavy smoker prior to 1997.

[¶ 15] Dr. William Simonet, an orthopedic surgeon, testified on behalf of WSI. Dr. Simonet conducted a records review of Swenson's medical history in order to offer his opinion on the cause of Swenson's spinal injuries. Dr. Simonet testified that Swenson's cervical and thoracic conditions were not the result of working in the oil field, and that Swenson's weight and history as a heavy smoker were major factors in his degenerative disc disease. He stated that according to the body mass index, Swenson was obese during his time in the oil field, and that "[e]xcess weight places excess load on the discs and therefore leads to early degenerative disc disease," regardless of whether the weight is fat or muscle. Dr. Simonet also explained that smoking is a scientifically proven risk factor for causation and acceleration of degenerative disc disease.

[¶ 16] Like Dr. Killen, Dr. Simonet was mistaken in his testimony about the extent of Swenson's lumbar fusion. However, while Dr. Killen thought his entire lumbar spine was fused, Dr. Simonet understated the extent of the fusion as two levels rather than three. Dr. Simonet disagreed with Dr. Killen's assertion that a fusion can cause problems all the way up the spine. He stated:

Adjacent level degeneration is the adjacent vertebrae or adjacent discs, shall we say, and it occurs because of the lever-arm effect. If you fuse one or two levels, you create a lever arm that transfers force to the next mobile disc. Fusing one or two levels does not change the force patterns to discs far above.

Dr. Simonet testified that he had never seen anything "in the world spine literature" to suggest there is any risk of degeneration in the thoracic or cervical spine from a lumbar spine fusion. He also disagreed with Dr. Killen's claim that doing manual labor is a particular risk factor for

accelerating degenerative disc disease. Dr. Simonet concluded the degenerative disc disease in Swenson's cervical and thoracic spine was "normal" and "age-appropriate."

[¶ 17] After considering the extensive record in this case, including the testimony of Dr. Killen and Dr. Simonet, the ALJ recommended affirming WSI's order denying Swenson benefits for the treatment of his cervical and thoracic spine. WSI adopted the ALJ's findings of fact and conclusions of law in their entirety and issued a final order denying benefits. The ALJ was not persuaded by either Dr. Killen or Dr. Simonet and explained at length the problems with each expert's testimony.

[¶ 18] As to Dr. Killen's opinion, the ALJ found it problematic for two reasons. First, the ALJ noted that Dr. Killen was mistaken in her understanding that Swenson's entire lumbar spine was fused, and concluded that this was a "significant, if not essential, factor for her advice and opinion concerning stress transferred to the thoracic and cervical portions of Swenson's spine and the resulting pain and functional impairment." Second, the ALJ was not satisfied with the basis for Dr. Killen's opinion that Swenson's spinal problems were causally related to his many years of work in the oil field. The ALJ stated:

> [W]hile I assume, of course, that Dr. Killen's advice concerning the nature and effect of the bony degenerative changes she identified in the cervical and thoracic portions of Swenson's spine and the effect of 15–years' work as a laborer in the oil fields upon the human spine are based upon her education, training, and experience, particularly her experience treating persons who have spent their working lives in the oil fields, and recognize her specialized training, education, and experience

for the practice of physical medicine and rehabilitation and her more comprehensive knowledge as Swenson's treating physician, considered together her advice and opinion is substantially anecdotal as based upon her experience treating patients. Experts should have experience. Generally, as a matter of experience and consistent with the advice of the supreme court, the advice and opinion of a practicing physician, especially a treating physician, is to be preferred to, for example, a medical school instructor or a consulting physician who does not treat patients for the injuries or diseases for which he or she offers advice and opinions. *But anecdotal evidence, even from a treating physician, is nonetheless unscientific and untested. Moreover, its interpretation and application cannot be evaluated for a particular case without some supporting evidence which comes with a hallmark of scientific authority such as, for example, a treatise or a published report of a study.*

(Emphasis added.)

[¶ 19] Turning to Dr. Simonet's opinion, the ALJ found it was "little better" than Dr. Killen's opinion. The ALJ noted that Dr. Simonet was also mistaken about the extent of Swenson's lumbar fusion, but concluded it was not a significant factor in his testimony about adjacent-level degeneration. The ALJ observed that Dr. Simonet had more limited experience than Dr. Killen, and his experience was "equally anecdotal." Furthermore, the ALJ found Dr. Simonet's references to the world's spinal literature during his testimony were puffery and did not provide support for his opinion.

[¶ 20] Weighing these medical opinions, the ALJ concluded Swenson had not proved by a preponderance of the evidence that the medical conditions in his cervical

and thoracic spine were causally related to his nineteen years of work in the oil field. The ALJ noted that Swenson had the burden of proof, which it characterized as "a particularly heavy burden for the medical opinion he offers." The ALJ explained why it found Swenson had not met his burden:

> Considering together Dr. Killen's mistaken understanding that Swenson's entire lumbar spine was fused, the lack of supporting scientific evidence for the anecdotal evidence of her experience, and the countervailing evidence of Dr. Simonet's advice and opinion, such as it is, it cannot reasonably be concluded by a preponderance of the evidence of record that it is more likely than not that the pain and resulting functional impairment which Swenson experiences is caused by a combination of the fusion of his lumbar vertebrae and bony degenerative changes of the thoracic and cervical portions of his spine resulting from 19–years' work in the oil fields as an oil rig hand and seismographer.

Swenson appealed WSI's final order denying him benefits to the district court. The district court affirmed.

## II

[¶ 21] On appeal from the district court, we review the decision of the administrative agency in the same manner the district court reviewed the decision of the agency, *Ziesch v. Workforce Safety & Ins.*, 2006 ND 99, ¶ 8, 713 N.W.2d 525, giving respect to the analysis of the review by the district court. *Genter v. Workforce Safety & Ins.*, 2006 ND 237, ¶ 12, 724 N.W.2d 132. Therefore, we must affirm the order of an administrative agency unless any of the following are present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

*Id.* (citing N.D.C.C. § 28–32–46).

[¶ 22] We exercise restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of WSI. *Fettig v. Workforce Safety & Ins.*, 2007 ND 23, ¶ 10, 728 N.W.2d 301. Rather, we determine only whether a reasoning mind reasonably could have decided that WSI's findings were proven by the weight of the evidence from the entire record. *Genter*, 2006 ND 237, ¶ 12, 724 N.W.2d 132. However, questions of law are fully reviewable on appeal from an administrative decision. *Fettig*, at ¶ 10, 728 N.W.2d 301.

[¶ 23] Swenson argues that he proved a compensable injury to his cervical and thoracic spine by a preponderance of the evidence, and therefore the ALJ erro-

neously concluded he was not entitled to benefits. In particular, Swenson contends the ALJ incorrectly evaluated Dr. Killen's medical opinion by requiring her to support her opinion with a treatise or other study.

[¶ 24] A claimant has the burden of proving by a preponderance of the evidence that he suffered a compensable injury and is entitled to workers compensation benefits. See N.D.C.C. § 65–01–11; *Barnes v. Workforce Safety & Ins.*, 2003 ND 141, ¶ 20, 668 N.W.2d 290. In order to carry this burden, a claimant must prove by a preponderance of the evidence that the medical condition for which he seeks benefits is causally related to a work injury. *Elshaug v. Workforce Safety & Ins.*, 2003 ND 177, ¶ 11, 671 N.W.2d 784. To establish a causal connection, a claimant must demonstrate that his employment was a substantial contributing factor to the injury, not that employment was the sole cause of the injury. *Myhre v. N.D. Workers Comp. Bureau*, 2002 ND 186, ¶ 10, 653 N.W.2d 705.

[¶ 25] A "compensable injury" is defined as "an injury by accident arising out of and in the course of hazardous employment which must be established by medical evidence supported by objective medical findings." N.D.C.C. § 65–01–02(10). Thus, a claimant must prove by objective medical evidence that he suffered a compensable injury. We have held that objective medical evidence may include a physician's medical opinion based on an examination, a patient's medical history, and the physician's education and experience. *Myhre*, 2002 ND 186, ¶ 15, 653 N.W.2d 705.

[¶ 26] WSI has the responsibility to weigh the credibility of medical evidence and resolve conflicting medical opinions. *Thompson v. Workforce Safety & Ins.*, 2006 ND 69, ¶ 11, 712 N.W.2d 309; *Negaard–Cooley v. N.D. Workers Comp. Bureau*, 2000 ND 122, ¶ 18, 611 N.W.2d 898. Confronted with a classic "battle of the experts," a factfinder may rely upon either party's expert witness. *Elshaug*, 2003 ND 177, ¶ 11, 671 N.W.2d 784. However, although WSI may resolve conflicts between medical opinions, the authority to reject medical evidence selectively does not permit WSI to pick and choose in an unreasoned manner. *Id.* WSI must consider the entire record, sufficiently address the evidence, and adequately explain its reasons for disregarding the evidence presented to it by the appellant. N.D.C.C. § 28–32–46(7); *Barnes*, 2003 ND 141, ¶ 20, 668 N.W.2d 290. Thus, particularly in cases where expert medical testimony is desirable if not essential to a determination of causation, WSI may not reject competent medical testimony without sufficiently addressing in its findings of fact its reasons for doing so which are adequately supported by the record. *Geck v. N.D. Workers Comp. Bureau*, 1998 ND 158, ¶ 13, 583 N.W.2d 621 (quotation omitted). Adequate reasons for rejecting appellant's evidence set forth in the agency's findings and supported by the record are necessary for us to determine whether or not the decision of the agency is to be affirmed under N.D.C.C. § 28–32–46(5), (6) and (7).

[¶ 27] We have declined to establish a presumption entitling a treating doctor's opinion to "great weight." *Myhre*, 2002 ND 186, ¶ 24, 653 N.W.2d 705. However, we do recognize that a long-term physician-patient relationship may provide the treating doctor with a more comprehensive view of the claimant's medical history and condition. *Id.* at ¶ 25, 653 N.W.2d 705.

[¶ 28] In this case, the ALJ was faced with conflicting medical opinions from Dr. Killen and Dr. Simonet about the cause of Swenson's injuries in his cervical and tho-

racic spine. WSI correctly points out that the ALJ did not simply ignore the medical testimony of Dr. Killen, which was favorable to Swenson. Rather, the ALJ extensively analyzed the medical opinions offered by both doctors and concluded that neither was very persuasive. However, under our standard for evaluating medical opinions, it is insufficient for the ALJ to merely provide any reason for disregarding competent medical testimony about causation. The ALJ must sufficiently address the reason for doing so which is supported by the record and complies with the prevailing law.

[¶ 29] The ALJ's rationale for discounting the opinion of Dr. Killen relied upon the importance of supporting a medical opinion with another scientific authority, such as a treatise or a published report of a study. Neither the statutes governing Workforce Safety & Insurance nor our case law has imposed such a requirement on those offering medical opinions as evidence in a workers compensation case. On the contrary, this Court has clearly stated that a physician's medical opinion may be based on an examination, a patient's medical history, and the physician's education and experience. Here, Dr. Killen offered a medical opinion about the cause of Swenson's cervical and thoracic injuries based on her personal experience in treating patients, her education, and her examination of Swenson. The ALJ characterized her opinion as merely "anecdotal evidence" and "unscientific and untested." However, Dr. Killen's opinion clearly qualified as objective medical evidence under our standard set forth in *Myhre*.

[¶ 30] We recognize that a medical opinion supported by a treatise or other scientific authority may be more persuasive, and in that sense WSI may consider whether a medical expert has presented such authority. But in this case, we conclude the manner in which the ALJ discounted Dr. Killen's opinion because it was not supported by other scientific authority crossed that line. An expert may present a competent, objective medical opinion based upon her experience, education, and examination of the patient, without corresponding support from a treatise or study. Such support may be persuasive, but it is not required. Because the ALJ applied an inappropriate standard when evaluating the medical opinions in this case, we reverse and remand to WSI for another hearing.

[¶ 31] Furthermore, there are factual errors underlying the opinions of both Dr. Killen and Dr. Simonet. Dr. Killen gave an opinion based upon the mistaken belief that Swenson's entire lumbar spine was fused, and Dr. Simonet mistakenly thought he had only a two-level fusion rather than a three-level fusion. The ALJ noted these errors and speculated about their effect on the testimony of each expert. The ALJ concluded that Dr. Killen's error was significant to her testimony, but that Dr. Simonet's error was less important to his explanation of adjacent-level degeneration. Although there may understandably be some confusion about the exact location of Swenson's lumbar fusion based on the different numbering systems used by various experts to label his extra sixth lumbar vertebrae, it is clear that Swenson has a three-level lumbar fusion. We are uncertain about the effect these errors may have had on each expert's opinion and unpersuaded by the ALJ's speculation on the matter. We recognize Swenson submitted additional evidence in the district court purporting to explain the effect of Dr. Killen's mistake on her testimony, but we do not consider that evidence here because it was not presented to the ALJ. On remand, these factual errors should be corrected.

[¶ 32] On remand, Swenson has the burden of proving by a preponderance of the evidence that his cervical and thoracic spinal injuries are causally related to his nineteen years of employment in the oil field. The ALJ correctly stated this standard in a conclusion of law, but later in its analysis observed that "Swenson has the burden of proof, a particularly heavy burden for the medical opinion he offers." We are also uncertain about the exact meaning of the ALJ's reference to a "particularly heavy burden." Swenson need only prove it is more likely than not that his injuries were caused by his employment.

## III

[¶ 33] We reverse the district court's judgment affirming WSI's order and remand for further hearing.

[¶ 34] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, MARY MUEHLEN MARING, and DONOVAN FOUGHTY, D.J., concurs.

[¶ 35] The Honorable Donovan Foughty, D.J., sitting in place of Crothers, J., disqualified.

SANDSTROM, Justice, dissenting.

[¶ 36] I respectfully dissent.

## I

[¶ 37] Under N.D.C.C. § 28–32–46, we must affirm the order of an administrative agency unless any of the following are present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 38] In 1977, the legislature amended the statute [1] to add subsection 5, adding the factor that the "findings of fact made by the agency are not supported by a preponderance of the evidence." In *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220–21 (N.D.1979), this Court held that to avoid constitutional infirmity in applying the subsection, either by violating the doctrine of separation of powers or by exercising a nonjudicial function, "we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record."

[¶ 39] In 2001, the legislature amended the statute by adding subsection 7,

---

1. What is now codified as N.D.C.C. § 28–32–46 was previously codified as N.D.C.C. § 28–32–19.

that the "findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant." The rationale of *Power Fuels* applies equally to this subsection: we do not reweigh the evidence or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the agency had sufficiently addressed the evidence presented by the appellant. *See id.* at 220.

[¶ 40] I understand the majority adheres to these principles.

## II

[¶ 41] The crux of my disagreement with the majority here is the meaning of the ALJ's words adopted by the department:

> [W]hile I assume, of course, that Dr. Killen's advice concerning the nature and effect of the bony degenerative changes she identified in the cervical and thoracic portions of Swenson's spine and the effect of 15–years' work as a laborer in the oil fields upon the human spine are based upon her education, training, and experience, particularly her experience treating persons who have spent their working lives in the oil fields, and recognize her specialized training, education, and experience for the practice of physical medicine and rehabilitation and her more comprehensive knowledge as Swenson's treating physician, considered together her advice and opinion is substantially anecdotal as based upon her experience treating patients. Experts should have experience. Generally, as a matter of experience and consistent with the advice of the supreme court, the advice and opinion of a practicing physician, especially a treating physician, is to be preferred to, for example, a medical school instructor or a consulting physician who does not treat patients for the injuries or diseases for which he or she offers advice and opinions. *But anecdotal evidence, even from a treating physician, is nonetheless unscientific and untested. Moreover, its interpretation and application cannot be evaluated for a particular case without some supporting evidence which comes with a hallmark of scientific authority such as, for example, a treatise or a published report of a study.*

(Emphasis added by the majority.) If these words reflect that as *a matter of law* the department concluded it cannot accept as competent evidence the testimony of a medical witness that is not supported by treatise, published report of a study, or other scientific authority, then the department erred as a matter of law. If, on the other hand, the department used the lack of treatise or other scientific authority supporting the testimony of one witness and the existence of such support for the testimony of the other witness as the basis for choosing to accept one over the other, then it is the legitimate and appropriate function of the fact-finder. I believe the fair reading of the words is that the fact-finder did not reject the unsupported testimony as a matter of law, but used the lack of support as a reasonable factor in deciding which testimony to accept.

## III

[¶ 42] I would, therefore, affirm.

[¶ 43] Dale V. Sandstrom