2009 ND 197

**Timothy R. SWENSON, Claimant and Appellant**

v.

**WORKFORCE SAFETY & INSURANCE FUND,** Appellee

and

**Nabors Drilling, USA, Inc., Respondent.**

**No. 20090138.**

Supreme Court of North Dakota.

Nov. 30, 2009.

Stephen D. Little, Bismarck, N.D., for claimant and appellant.

Jacqueline Sue Anderson, Special Assistant Attorney General, Fargo, N.D., for appellee.

MARING, Justice.

[¶ 1]   Timothy R. Swenson appeals from a judgment affirming an order of Workforce Safety & Insurance Fund ("WSI") denying him benefits for treatment of his cervical and thoracic spine conditions. Because we conclude WSI's findings of fact are supported by the greater weight of the evidence and sufficiently address the evidence submitted in support of Swenson's claim, we affirm the judgment.

I

[¶ 2]   On May 15, 1997, Swenson, 37 years old at the time, injured his lower back while employed as an oil field worker and WSI paid him benefits. He ultimately underwent several surgeries to address problems with his back and spine. After an MRI revealed herniated discs at L3–L4 on the right and at L4–L5 on the left, Swenson underwent a partial hemilaminectomy in August 1997 to remove these extruded discs. When he continued to have pain radiating into his legs after the surgery, Swenson was diagnosed with "failed spine surgery syndrome" and it was discovered he had an extra sixth lumbar vertebra, resulting in the surgery actually having been performed at L4–L5 and L5–L6. In February 2000, Swenson had a revision decompression and an anterior posterior fusion from L4–L5 and L5–S1.

Following the second surgery, Swenson began complaining about a radiating pain in his cervical spine, and in March 2001, he had a lumbosacral decompression and fusion for unilateral spondylolysis at S1–S2, below the previous two-level fusion.

[¶ 3]   By June 2001, Swenson reported increased pain in his back, neck, and legs, and numbness in his left hand. Swenson's physician recommended an MRI on his cervical spine, but WSI denied payment stating Swenson had failed to prove his cervical spine problems were the direct result of his 1997 work injury. Although Swenson sought reconsideration and a hearing, he withdrew his request for a hearing and WSI's decision became final. In April 2002, Swenson had a revision lumbar decompression and fusion at S1–S2, but afterward continued to complain of cervical pain and began to report thoracic pain. Swenson was referred to Dr. Shelley Killen, a physiatrist, for non-surgical treatment of the spine. Dr. Killen diagnosed Swenson with "failed back syndrome," and in response to an inquiry from Swenson's attorney, opined that his cervical and thoracic conditions were more likely than not related to his 15 years of heavy oil field work.

[¶ 4]   In February 2004, Swenson filed a new claim for benefits with WSI for a progressive injury to his entire spinal column for the years "1978–2004" allegedly caused by working for 19 years as a drilling rig hand and seismographer. Swenson had not worked since his 1997 injury. After WSI denied the claim, Swenson requested reconsideration and told WSI his treating physician, Dr. Killen, considered his cervical and thoracic spine conditions to be causally related to his years of heavy oil field work. A formal administrative hearing was eventually held in February 2006, and Dr. William Simonet, an ortho-

pedic surgeon, testified on behalf of WSI that Swenson's conditions were not work related. The administrative law judge ("ALJ") found Swenson had not established a work-related cervical or thoracic spine condition, WSI adopted the ALJ's recommendation, and the district court affirmed WSI's decision. In *Swenson v. Workforce Safety & Ins. Fund*, 2007 ND 149, ¶ 1, 738 N.W.2d 892, a majority of this Court concluded the ALJ did not apply the correct legal standard in evaluating the medical evidence and reversed and remanded for another hearing on whether Swenson's "cervical and thoracic spinal injuries are causally related to his nineteen years of employment in the oil field." *Id.* at ¶ 32.

[¶ 5] During the hearing on remand before a different ALJ, Swenson testified and introduced a letter from Dr. Killen. Dr. Simonet testified for WSI. The ALJ found Swenson "failed to sustain his burden of proving that his cervical and thoracic spine condition is related to his work in the oil field." WSI adopted the ALJ's recommendation and the district court affirmed WSI's decision.

## II

[¶ 6] On appeal, Swenson argues WSI's findings of fact are not supported by the greater weight of the evidence and do not sufficiently address the evidence submitted in support of his claim.

[¶ 7] Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm a decision of WSI unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28–32–46. We exercise restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence and do not make independent findings or substitute our judgment for that of WSI. *Bergum v. North Dakota Workforce Safety and Ins.*, 2009 ND 52, ¶ 9, 764 N.W.2d 178. On appeal, we determine "whether a reasoning mind reasonably could have decided [WSI's] findings were proven by the weight of the evidence from the entire record." *Von Ruden v. North Dakota Workforce Safety & Ins. Fund*, 2008 ND 166, ¶ 8, 755 N.W.2d 885.

[¶ 8] A claimant for WSI benefits has the burden of demonstrating that his employment was a substantial contributing factor to the injury, not that employment was the sole cause of the injury. *Swenson*, 2007 ND 149, ¶ 24, 738 N.W.2d 892. In *Bruder v. North Dakota Workforce Safety and Ins. Fund*, 2009 ND 23, ¶ 9, 761 N.W.2d 588 (quoting *Huwe v. Workforce*

*Safety and Ins.*, 2008 ND 47, ¶ 10, 746 N.W.2d 158), this Court said:

> WSI has the responsibility to weigh the credibility of medical evidence and resolve conflicting medical opinions. When confronted with a classic "battle of the experts," a fact-finder may rely upon either party's expert witness. Although WSI may resolve conflicts between medical opinions, the authority to reject medical evidence selectively does not permit WSI to pick and choose in an unreasoned manner. WSI must consider the entire record, clarify inconsistencies, and adequately explain its reasons for disregarding medical evidence favorable to the claimant.

[¶ 9] At the hearing on remand, Swenson testified about his strenuous oil field work. He also submitted a letter from Dr. Killen, in which she opined that "the years of oil field work, and in particular the 7 years on a seismographic crew carrying neck rolls, would more probably than not, in my medical opinion, be the cause of Mr. Swenson's cervical condition. This is the same opinion I have had since the questions were initially posed to me in 2003."

[¶ 10] Dr. Simonet opined that Swenson's working in the oil field was not a substantial contributing factor in the development of his cervical and thoracic conditions. Dr. Simonet testified:

> Q. Doctor, in your opinion, was the heavy work that Mr. Swenson did in the oilfields for almost 20 years a substantial contributing factor to his thoracic and cervical spine complaints and problems?
>
> A. No.
>
> Q. Why not?
>
> A. Again, for the reasons we've been talking about. First of all, there's nothing that unusual about oilfield labor that's any different from heavy, manual labor in other fields, and there's nothing to suggest that labor in and of itself

increases one's risk for cervical or thoracic spine degeneration.

> Secondly, the patient does have other risk factors for his cervical and thoracic spine degeneration, including simply naturally occurring degenerative processes, as well as cigarette smoking.
>
> Thirdly, there is no history, that I'm aware of, of the patient having sustained repetitive specific injuries to his cervical or thoracic spine, such as I alluded to in my football player analogy, which would lead on an accumulated basis to degeneration of the spine.
>
> . . . .
>
> Q. . . . With respect to then the heavy work that people may do, intuitively it seems like if you do heavy load, I mean, carry heavy things, it seems like we feel like that should have an effect on the lumbar spine. If you do heavy work and it causes degeneration, you know, somehow or other when we're listening to that type of work that people may be doing, intuitively we maybe think that has to have an effect on the degeneration of the spine. Why intuitively shouldn't we believe that?
>
> A. Well, that would have to do with the issue of are you injuring the human body or are you simply using the human body? The human body is made to be used, and as we've been talking about, if somebody doesn't use the human body, for instance, somebody who's paraplegic and can't move their legs or their lumbar spine at all, they will develop very severe degeneration of the joints that they're not using because the human body is meant to be used. Now, that doesn't mean that if you keep injuring it—and I'm not talking about simply using it; I'm talking about injuries. The football player that repeatedly injured his discs, has pain, has treatments, sits

out a few games, recovers, goes back and does the same thing over and over, yes, the literature would support that that player will develop degeneration of that disc over time, but that's different from simply using the human body the way it's meant to be used, which could include heavy labor.

[¶ 11] Relying on Dr. Simonet's opinion, the ALJ concluded Swenson failed to prove that his cervical and thoracic spine conditions are related to his years of work in the oil fields. The ALJ found that Dr. Killen's opinion was "not credible" because her theories on the cause of Swenson's conditions changed over time and were inconsistent. Swenson argues this finding is not supported by the greater weight of the evidence.

[¶ 12] The ALJ extensively explained her reasons for rejecting Dr. Killen's opinion:

13. . . . First, Mr. Swenson did not have his entire lumbar spine fused. He had a three-level lumbar fusion. The entire premise of Dr. Killen's opinion is based on her mistaken idea that his entire lumbar spine was fused and accordingly, her opinion has little credibility. Second, her opinion that his cervical and thoracic conditions are related to his fifteen years of heavy oil field work, does not jibe with the opinion she first expressed—that Mr. Swenson's back pain was caused by the "extensive" fusion. Third, Dr. Killen's second opinion was rendered after Mr. Swenson's claim for benefits for his cervical condition had been denied and that decision became final, and the opinion was rendered in anticipation of an administrative hearing on Mr. Swenson's new theory of causation. Fourth, Dr. Killen does not explain how Mr. Swenson's cervical pain can be related to his nineteen years of heavy oil field work, rather than the

May 15th work injury, when Mr. Swenson has maintained that his cervical pain has existed since his work injury. Nor does Dr. Killen explain how Mr. Swenson's current problems can be related to his work when he didn't complain of cervical pain until late 1999 and he hasn't worked since 1997. She could not explain why medical records prior to 1999 did not mention any neck pain. Nor does she address the fact that Mr. Swenson is obese and a smoker. Both of those conditions are risk factors for degenerative disc disease, which Mr. Swenson has. Further, Dr. Killen's opinion is not shared by Dr. William Simonet, who explained that Mr. Swenson's lumbar fusion would not produce pain all the way up the thoracic and cervical spine. Rather, the fusion would cause Mr. Swenson to be at increased risk for problems associated with the levels adjacent to the fusion. Dr. Killen implicitly acknowledges the correctness of Dr. Simonet's explanation, stating that "[i]f it's for one segment, you're probably not going to see the entire spine, but when you take out the whole, entire lumbar portion, I think you can develop myofascial problems all the way up." Mr. Swenson did not have his entire spine fused. He had three lumbar segments fused and he could expect to develop problems in the adjacent levels, immediately above and below the fusion.

14. By letter dated July 19, 2006 to Mr. Swenson's counsel, Dr. Killen acknowledged that she was mistaken about the extent of Mr. Swenson's fusion, but "Mr. Swenson holds that entire portion of his body extremely stiffly which would certainly, on exam, make one question whether or not the entire spine had been fused." Exhibit 185, p. 453. Dr. Killen's explanation for not being familiar with the extent of Mr. Swenson's fusion is weak. With regard

to whether the medical literature would support either her or Dr. Simonet's opinion, she said, "I believe that the literature would support that once a level is fused, there is definitely translation of the forces up several levels. Nowhere during my deposition did I say that the lumbar spine would affect the cervical spine in terms of that fusion, I only referenced that to the thoracic spine." *Id.* Dr. Killen's statement that a fusion would translate forces up several levels correlates with Dr. Simonet's and is directly contrary to her previous opinion and deposition testimony that a complete lumbar fusion could cause myofascial problems "all the way up" to the neck. Exhibit 180, p. 439 (27:24).

15. During her deposition, Dr. Killen dismissed the MRI findings of degenerative changes in someone Mr. Swenson's age as something other than changes caused by manual labor. Although she characterized the degenerative changes in the thoracic and cervical spine as "[m]ild to moderate," she said that she does not see such thoracic degenerative changes until a person is very old, unless they do manual labor. And she said she would be surprised to see the same type of degeneration of the cervical spine in a person forty-five "without some minor trauma someplace." Exhibit 180, p. 439 (23:25). On the other hand, by letter dated July 19, 2006, Dr. Killen said that her testimony was that "I do believe that the cervical changes may be found in someone his age, but unless someone is doing heavy manual labor I would not expect any of the thoracic changes." Exhibit 185, p. 453. So, first Dr. Killen says that she would be surprised to see a forty-five year old with mild to moderate degenerative changes in their thoracic and cervical spine without minor trauma or manual labor. Then she said that the cervical changes might be found in any forty-five year old, but not the thoracic changes. Dr. Killen's opinion doesn't make sense. First she says that the cervical problems are related to the lumbar fusion. Then she says they aren't. Then she says that the cervical condition is due to the work in the oil field, then she says the same cervical changes can be found in any forty-five year old. On March 30, 2008, and in response to a letter from Mr. Swenson's counsel, Dr. Killen stated that it was still her opinion that Mr. Swenson's work in the oil field, especially his work on the seismographic crew carrying neck rolls, would more probably than not be the cause of Mr. Swenson's cervical condition. Dr. Killen says her opinion is based on her personal experience caring for persons who work in the oil fields. But her opinion keeps changing.

[¶ 13] We reject Swenson's contention that the ALJ "misstat[ed]" Dr. Killen's opinion concerning the cause of his cervical and thoracic spine condition. The ALJ accurately described the inconsistencies in Dr. Killen's statements about the cause of Swenson's condition. Inconsistencies in a medical expert's opinions may be considered by WSI in assessing the credibility of medical evidence. *See, e.g., Bergum*, 2009 ND 52, ¶¶ 17, 20, 764 N.W.2d 178. Swenson also stresses that Dr. Simonet based his opinion solely on a records review, and unlike Dr. Killen, had never examined Swenson. However, this Court has refused to create a presumption entitling a treating physician's opinion to "great weight." *Swenson*, 2007 ND 149, ¶ 27, 738 N.W.2d 892.

[¶ 14] Swenson contends Dr. Simonet improperly focused on non-work risk factors in attributing a cause for his cervical and thoracic conditions, and by adopting Dr. Simonet's opinion, WSI also improper-

ly focused on non-work risk factors. Swenson relies on *Manske v. Workforce Safety and Ins.*, 2008 ND 79, 748 N.W.2d 394, in which this Court noted:

> We have said, in a long line of cases, that a worker's employment need not be the sole cause of an injury to be compensable. Nor must a claimant prove the work-related injury is a primary cause of the work injury. It is sufficient if a work condition is a substantial contributing factor to the disease.
>
> . . . .
>
> The fact that an employee may have physical conditions or personal habits which make him or her more prone to such an injury does not constitute a sufficient reason for denying a claim.

*Id.* at ¶¶ 9, 12 (internal citations omitted). Swenson argues WSI's analysis is flawed in this case because the "issue is not Mr. Swenson's age, genetics or personal habits, but rather the effects of 19 years of heavy oil field labor on his cervical and thoracic spine."

[¶ 15] In *Manske*, 2008 ND 79, ¶¶ 1, 2, 748 N.W.2d 394, the claimant sought death benefits for the lung cancer death of her husband, who had smoked up to three packs of cigarettes per day, and alleged his lung cancer was caused by occupational asbestos exposure. WSI denied benefits, concluding the claimant had failed to prove the lung cancer was the " 'direct result' " of her husband's asbestos exposure. *Id.* at ¶ 7. We concluded WSI erred in analyzing whether the claimant's husband's smoking habit or his asbestos exposure was the primary or direct cause of his lung cancer, rather than determining whether the asbestos exposure was simply a substantial contributing factor. *Id.* at ¶ 11. "While Robert Manske's smoking habit may be a cause of his lung cancer, the analysis should focus on whether his asbestos expo-sure is a substantial contributing factor." *Id.* at ¶ 13.

[¶ 16] WSI did not err in its legal analysis of this case. Although Dr. Simonet and the ALJ discussed the non-work risk factors of obesity and smoking, *Manske* demonstrates that even if non-work risk factors are substantial contributing factors to an injury, WSI must nevertheless determine whether the work condition is a substantial contributing factor to the injury. *Manske*, 2008 ND 79, ¶¶ 11–13, 748 N.W.2d 394. The ALJ in this case did not determine that non-work risk factors of obesity and smoking were the primary or direct cause of Swenson's cervical and thoracic spine conditions. Rather, Dr. Simonet testified that Swenson's heavy oil field work was not a "substantial contributing factor," and the ALJ specifically agreed with Dr. Simonet's opinion that "Swenson's lumbar fusion and his work in the oil field are not substantial contributing factors to his cervical and thoracic spine conditions." WSI's legal analysis is not flawed.

[¶ 17] Having reviewed the record, we conclude that a reasoning mind reasonably could have determined the factual conclusions reached by WSI were proved by the greater weight of the evidence in the record, and that WSI adequately explained its reasons for disregarding medical evidence favorable to Swenson.

## III

[¶ 18] Because WSI did not err in denying Swenson's claim for benefits, we affirm the judgment.

[¶ 19] GERALD W. VANDE WALLE, C.J., BRUCE E. BOHLMAN, S.J., DANIEL J. CROTHERS, and CAROL RONNING KAPSNER, JJ., concur.

[¶ 20] The Honorable BRUCE E. BOHLMAN, S.J., sitting in place of SANDSTROM, J., disqualified.